Charles Ray DORSEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–02–023 CR.

Court of Appeals of Texas,
Beaumont.

Submitted May 13, 2003.

Decided Aug. 28, 2003.

James B. Parks, Law Office of Jimmy B. Parks, Jr., and Kimberly S. Keller, The Keller Group, San Antonio, for Appellant.

Michael A. McDougal, Dist. Atty., Mike Griffin and Gail Kikawa McConnell, Asst. Dist. Attys., Conroe, for State.

Before BURGESS, GAULTNEY and BOYD, JJ.

## OPINION

JOHN T. BOYD *, Justice.

In this appeal, appellant Charles Ray Dorsey challenges his conviction of murder and the jury-assessed punishment of forty years' confinement in the Institutional Division of the Texas Department of Criminal Justice. In pursuing his appeal, he presents sixteen issues for our determination. We will discuss those issues sequentially as their decision may become necessary to the disposition of this appeal. For reasons hereinafter stated, we modify the judgment of the trial court. As modified, the judgment is affirmed.

* The Honorable John T. Boyd, sitting by assignment pursuant to TEX. GOV'T CODE ANN. § 74.003(b) (Vernon 1998).

Early on the morning of May 14, 1996, appellant Charles Dorsey called 911 and reported that his wife Pamela had been shot. When the operator queried if the person who shot her was still present, appellant replied, "It's my little boy. He got in her purse and got her gun." De-Lane Potter, a patrol security officer for appellant's residential subdivision, who was first on the scene, testified that he found Pamela in the bedroom, lying face down on the bed covered up to her neck with a blanket and sheet. He testified that when he arrived, appellant was very upset and the couple's child, two and one-half years old at the time, was confused and disoriented. There was evidence that Pamela died as a result of a gunshot wound to the head. Other portions of the rather extensive evidence will be referred to as it may become necessary to a discussion of the questions presented in this appeal.

▇▇▇ In his first four issues, appellant contends the trial court reversibly erred in admitting evidence of the movie NEVER TALK TO STRANGERS (Columbia/Tristar 1995) because 1) it amounted to a comment on the weight of the evidence, 2) it was irrelevant, 3) it was in violation of Texas Rule of Evidence 404(b), and 4) its probative value was exceeded by its prejudicial value. Because they are interrelated, appellant argues them together. We will likewise consider them together.

As an appellate court, we review the trial court's decision to admit or exclude evidence under an abuse of discretion standard, and we may not reverse a trial court if its ruling was within the zone of reasonable disagreement. *See Green v. State,* 934 S.W.2d 92, 101–02 (Tex.Crim.App. 1996). Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R. EVID. 401. Rule 402 provides that all relevant evidence is admissible except as otherwise provided by the Constitution, by statute, by the rules of evidence or by any other rules adopted pursuant to statutory authority. *See* TEX.R. EVID. 402. In applicable part, Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." TEX.R. EVID. 403. In relevant part, Rule 404(b) provides that evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in conformity therewith. Such evidence, however, may be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *See* TEX.R. EVID. 404(b).

At trial, and after the State had presented its case in chief, appellant presented a vigorous defense supporting his assertion that the fatal shots were accidentally fired by his infant son. As a part of the State's rebuttal evidence, Montgomery County Sheriff's Detective Bonnie Tidwell was allowed to testify, over objection, that she had viewed the movie NEVER TALK TO STRANGERS. In particular, she said the movie concerned a female psychiatrist who has a flash back in which she remembers that when she was a child, her father "tells the little girl [the psychiatrist] to stay with him. He takes her in front of him, has a gun in his hand, takes the little girl's hands that's on the weapon, on the trigger, puts his hands over hers, pulls the trigger and kills her mother." Subsequently, "she [the psychiatrist] killed her father and the police officer [with whom she had been involved]. And then she went on with her life."

Appellant initially argues that the State failed to offer evidence that appellant had ever watched the movie or was aware of the movie's plot, thus the probative value, if any, arising from the movie was substantially outweighed by its prejudicial effect. To lay a predicate for the movie's admission, the State produced Peggy Sue McRae, a clerk at the "Take One Video" in May of 1996. Ms. McRae testified that the records of the video rental company showed that the movie was checked out by appellant on May 5, 1996, and was returned on May 6, 1996, approximately one week prior to the death of Pamela Dorsey. When she read about the circumstances of the shooting in the newspapers, her curiosity was piqued, she looked at Charles and Pamela Dorsey's account, noticed that the last rental was the movie in question, and told her supervisor that "the rental of this movie . . . might be pertinent to this case." Subsequently, the records of Take One Video relating to the rental were subpoenaed.

At trial, on direct examination by the State, McRae's testimony that she checked the movie out to appellant was unequivocal. When cross-examined about testimony in a prior trial of this case in which the record showed she had said she rented the movie to Pam and Chad Dorsey (appellant), McRae averred she did not remember that prior testimony, and reiterated that her present testimony as to the person to whom the movie was checked out was correct. Under redirect testimony, she testified that she particularly remembered the occasion because of the death of appellant's wife the week after the movie was rented, and that appellant had some physical characteristics that were "substantially different" from any of the other renters with whom she had contact. Even assuming there may have been conflicts between her testimony in the first trial and her testimony in this one, her testimony was still sufficient to bring it within the jury's exclusive province of resolving conflicts and assessing the credibility of the testimony and the weight to be given it.

In supporting his position that the admission of the testimony requires reversal, appellant argues that the only evidence connecting appellant with the movie was the "conflicting" testimony of the clerk. He reasons that even viewing her testimony in a light most favorable to the State, the State failed to bring any evidence that appellant actually watched the movie or was aware of the plot. As highlighting the differences in a proper predicate laid for the admission of movies, and the predicate laid here, appellant cites two cases, namely *Morton v. State*, 761 S.W.2d 876 (Tex. App.-Austin 1988, pet. ref'd), and *Parrish v. State*, 950 S.W.2d 720 (Tex.App.-Fort Worth 1997, no pet.). That reliance warrants a discussion of the cases.

In *Morton*, the State's theory was that Morton had killed his wife in a fit of sexual frustration and anger after she had refused him sex. *Morton*, 761 S.W.2d at 877. In the appeal, the court addressed Morton's contention that a statement, in which he admitted that he and his wife had watched a sexually explicit movie prior to her rejection of him, was involuntary and not admissible. *Id.* at 878–79. It was in that context that the appellate court held Morton's statement was voluntary and properly admitted. *Id.* at 879. Because the statement was admissible, it was uncontroverted that Morton had watched the film, and thus the court had no occasion to discuss or consider the predicate necessary in an instance such as that before us. Indeed, more relevant is the court's discussion in which it held that the case depended upon circumstantial evidence and in such a case, the probative value of the portion of the film admitted exceeded its prejudicial effect. *Id.* at 881. Of course,

the instant case is also a circumstantial one.

In *Parrish*, the State's theory was that appellant had murdered his wife to collect on her life insurance policy. *Parrish*, 950 S.W.2d at 721. The videotape in question there was made by the appellant and revealed that he had thought about collecting death benefits by defrauding an insurance company. *Id.* at 723–24. The court was concerned with the question whether the probative value of the evidence was outweighed by its prejudicial effect. *Id.* It concluded that the tape was admissible and relevant in establishing Parrish's intent, preparation, and plan to commit the crime charged. *Id.* at 724. The court had no occasion to discuss the requisites of a proper predicate in such a case because it was undisputed that the appellant had created the video. Rather, the court's primary concern was whether the prejudicial value of the video exceeded its probative value. The court concluded the tape was relevant as establishing the defendant's intent, preparation, and plan to commit the crime charged. In the course of its opinion, it noted, to the extent the evidence was prejudicial, "such is the inherent nature of evidence used by the State to prove its case." *Id.*

It is axiomatic that determining the credibility of evidence and the weight to be given that testimony is within the province of the jury. In this circumstantial evidence case, the evidence was relevant and admissible to show appellant's motive and intent and that the shooting was not the result of an accidental firing by his two and one-half year old son. It was also sufficient to justify a reasonable conclusion that appellant did rent the film, did so for the purpose of viewing it, and that he viewed it.

Having made that decision, it now becomes necessary to review appellant's con-

tention that the prejudicial effect substantially outweighed its probative value. In the seminal case of *Taylor v. State*, 920 S.W.2d 319, 322 (Tex.Crim.App.1996), the Court of Criminal Appeals explicated that in making a determination of this kind, the reviewing court should consider: "1) whether the ultimate issue was seriously contested by the opponent of the evidence; 2) whether the State had other convincing evidence to establish the ultimate issue to which the disputed evidence was relevant; 3) the compelling nature, or lack thereof, of the evidence; and 4) the likelihood that the evidence was of such a nature to impair the efficacy of a limiting instruction." *Id.* at 322.

In applying those factors, first, the ultimate issue here, *i.e.*, whether appellant's wife was shot by accident or whether appellant was the actual killer, was hotly contested. Second, the State had no other convincing evidence as to why appellant would say his small son shot Pamela. Third, only brief testimony about the movie was admitted rather than the movie itself. Fourth, because the movie concerned a fictional murder, it is unlikely that the jury would have used it for anything other than the purpose for which it was admitted. We conclude that in this circumstantial evidence case, the probative value of the evidence was not substantially outweighed by its prejudicial value. Thus, the trial court did not abuse its discretion in admitting the tape. Appellant's first four issues are overruled.

Appellant's next six issues concern the admission into evidence of a video tape of his son Conner's interaction with the holstered gun used in Pamela's shooting. The purpose of the tape was to determine whether Conner had the physical capability of pulling the trigger of the gun. The tape showed that Conner had the physical capability of pulling the trigger of the gun

when the hammer was cocked but could not do so when the gun was not cocked. It also showed that Conner could not open the holster when it was strapped shut.

The issues are interrelated and we will discuss them together. In issues five and six, appellant contends his federal and state due process rights were violated because the State maintained inconsistent positions between the first trial[1] and the second trial of this case. In his seventh, eighth, ninth, and tenth issues, appellant argues the trial court reversibly erred in denying his motion to suppress the video tape because it constituted an improper experiment, it constituted an improper interview, it constituted hearsay, and the tape was obtained in violation of a valid court order.

The tape was shot in an interview room at the sheriff's office. In the course of overruling appellant's objection to the admission of the tape, having previously viewed the tape, the trial court made findings that: 1) it was immaterial whether the taped episode was called an experiment or an interview; 2) significant factors were "the presence of the child, gun, holster, lighted room, apparently no pressure exerted one way or the other by anyone on the child;" and 3) it was not relevant whether the episode was filmed in a room that did not have a bed, whether or not there was a body there, and whether or not it looked like the room in which the decedent expired. Indeed, he opined, where the tape was shot was more conducive to a reasonable, realistic result than if it had occurred in the bedroom where the child may have had memories.

The record contains Officer Tidwell's description of the events shown on the tape. Other than the general objections to the admission of the tape we have noted, ap-

pellant initially made no objection to the narration of the events depicted. Tidwell's narrative was made as the tape was running before the jury and they could observe themselves what was taking place. Tidwell initially described the child running in front of her into the room. He picked up a couple of dolls that were in the room, looked at them briefly, threw them away, and went to the gun. It was not until that point that appellant objected to Ms. Tidwell's narrative of the events being shown on the tape. His objection was that "the tape which is in evidence speaks for itself." That objection was not timely.

The tape continued to the point where the child picked up the weapon and attempted to open the strap part on the holster. Ms. Tidwell then narrated that when the child could not open the holster because of the strap on it, "we both together got it open and he took the weapon out of the holster and began to look at it." She described the child's unsuccessful efforts to cock the double action pistol or to pull the trigger when it was uncocked.

Appellant initially argues that the State maintained inconsistent positions between the first and second trials "as to whether Conner's video tape was an *interview* or whether it was an *experiment.*" He posits that the difference in the terms occurred after his initial objection. The change in terminology, he contends, was material and adversely affected his due process rights because if the occurrence was an experiment, "it raised the legal issues regarding the legal requirements of an admissible police experiment." As best we understand, he reasons that the State's transition to the term "interview" was an attempt "to shield itself from the legal requirements of an admissible experiment"

---

**1.** In the first trial, appellant's conviction was reversed by the Beaumont Court of Appeals.

*See Dorsey v. State,* 24 S.W.3d 921, 930 (Tex. App.-Beaumont 2000, no pet.).

and would lessen the State's burden to establish the admissibility of the evidence.

With regard to the admissibility of experiments, appellant cites and relies upon *Marras v. State*, 741 S.W.2d 395 (Tex. Crim.App.1987), *overruled on other grounds by Garrett v. State*, 851 S.W.2d 853 (Tex.Crim.App.1993); *Esquivel v. State*, 595 S.W.2d 516 (Tex.Crim.App. 1980); and *Lopez v. State*, 651 S.W.2d 413 (Tex.App.-Fort Worth), *rev'd and remanded on other grounds*, 664 S.W.2d 85 (Tex. Crim.App.1983). These cases stand for the general principle that the results of an out-of-court experiment is admissible within the discretion of the trial court if the experiment was made under conditions similar to the event to which the results of the experiment relate. *See Esquivel*, 595 S.W.2d at 529. However, that principle is qualified by the fact that an experiment not made under exactly the same conditions goes to the weight and not the admissibility of the evidence. *Id.*

In arguing that the taped events were, in effect, a recreation of the crime, appellant places considerable reliance upon the statement by the *Lopez* court that "any staged, re-enacted criminal acts or defensive issues involving human beings" are "inherently dangerous, offer little in substance and the impact of re-enactments are too highly prejudicial to insure the State or the defendant a fair trial." *Lopez*, 651 S.W.2d at 416. We find the reasoning the court employed in *Marras* helpful in considering this argument. In *Marras*, a capital murder case, the court was concerned with a videotape that showed the area through which an eyewitness walked after the witness viewed the crime. *Marras*, 741 S.W.2d at 404. The events shown on the tape were narrated by the witness as it was shown. *Id.* Marras had objected to the admission of the tape on the basis that the tape was not an accurate "duplica-

tion" and asked the appellate court to apply the reasoning of the *Lopez* court and hold the trial court erred in admitting the tape. *Id.* In considering that argument, although approving the *Lopez* explication, the *Marras* court said because the tape only showed the route taken by the witness and the accused after the crime was actually committed, it did "not depict any staged, re-enacted criminal acts" and the trial court did not abuse its discretion in admitting the tape. *Id.* Regardless of the nomenclature of the events pictured in the tape here, the reasoning employed by the *Marras* court is applicable. The events depicted on the tape were not a re-enactment of the crime itself, the tape was taken after the crime, and the weight to be given the events depicted was a matter within the purview of the jury as factfinder. The trial court did not abuse its discretion in admitting the tape. Appellant's fifth and sixth issues are overruled.

In his seventh, eighth, and ninth issues, appellant contends that the videotape was the result of an improper experiment or interview and thus was inadmissible as hearsay. In advancing that proposition, he initially reasons that the events shown on the tape were analogous to the child testifying and, because the child was not placed under oath, nor was there any showing that he was competent to understand the obligation that court testimony be truthful, the tape was not admissible. We agree with the State that videotape of the activities of the child is comparable to the videotapes of a driver alleged to be intoxicated. The Court of Criminal Appeals has held visual depictions of sobriety tests are not testimonial and do not violate a defendant's federal or state constitutional right against self-incrimination. *See Miffleton v. State*, 777 S.W.2d 76, 80 (Tex. Crim.App.1989); *see also Gassaway v. State*, 957 S.W.2d 48, 50–51 (Tex.Crim.App.1997)(recitation of the al-

phabet and counting backwards in sobriety tests are not testimonial in nature and thus are not within the purview of Fifth Amendment protection).

In this case, the videotape was played before the jury without sound. As we noted above, there was no attempt to recreate the actual shooting. That being so, and because the actions of the child were merely being observed, the rather strict restrictions governing the determination of the competency of child witnesses are not applicable here.

Appellant next contends that the child's activities in response to questions by Tidwell[2] amounted to inadmissible hearsay. He argues the fact that the child responded to Tidwell's questions by actions rather than words does not mean that Conner was not communicating with Tidwell. Thus, any opinion arrived at by Tidwell as to the child's ability to pull the trigger of the gun must necessarily be based upon the child's out-of-court conduct, *i.e.,* inadmissible hearsay. To support that argument, appellant cites and relies upon *D.L.N. v. State*, 590 S.W.2d 820 (Tex.Civ. App.-Dallas 1979, no writ), a prosecution for alleged deviate sexual intercourse. However, that case is distinguishable. In *D.L.N.,* in response to questions asked by the prosecution, the father of the complainant was allowed to testify about the child's re-enactment of the acts giving rise to the prosecution. *Id.* at 822. A minister was also present at the time and was allowed to testify about the child's actions in response to the questions. *Id.* It was in that context the appellate court decided the testimony was inadmissible hearsay. *Id.* In the instant case, none of the circumstances of appellant's version of the shooting were attempted to be re-enacted. Rather, the child simply performed physical responses that, when viewed by the jury, were relevant and admissible to aid them in assessing the credibility of appellant's testimony. Appellant's seventh, eighth, and ninth issues are overruled.

In his tenth issue, without citation of case authority, appellant complains that the trial court reversibly erred in denying his motion to suppress the videotape described above because it was allegedly obtained in violation of a court order. The failure to cite relevant authority could result in the waiver of this issue. *See* Tex. R.App. P. 38.1(h); *Salazar v. State*, 38 S.W.3d 141, 147 (Tex.Crim.App.2001). However, because of appellant's diligent briefing on other issues, in the interest of justice, we will consider the question presented. The record reveals that Child Protective Services took custody of Conner under an emergency order on May 24, 1996. A hearing was held on the matter on the morning of May 28, 1996, the next working day. As a result of the hearing, custody of the child was awarded to Conner's maternal grandparents.

At the suppression hearing, James McClure, the child's maternal grandfather testified. He averred he was present when the judge awarded custody of Conner to him and his wife, although they did not pick the child up until 6:00 or 7:00 in the evening of May 28. He said that at the hearing, the District Attorney had asked them to come to his office. When the couple arrived at the District Attorney's office, they were told that the authorities did not know exactly where Conner was at the time because the person in possession of him was "shopping or something." They were informed the authorities would let them know as soon as they contacted "her." Evidently, that reference was to the person with whom the child had been temporarily placed. When they were

---

**2.** The jury did not hear the audio on the videotape.

later contacted, they were told to pick the child up at the Sheriff's office. In his testimony, McClure said that although no video taping was mentioned, he was told the Sheriff's Department wanted to see if Conner could handle the gun. His response was that would be fine, but he wanted them to do it before "I got ahold of him [the child] because I wanted to bring him back." Although McClure did not see the tape until later, when he did so, he said he was glad it was made and had no objection to it. Appellant's tenth issue is overruled.

■ Appellant's eleventh, twelfth and thirteenth issues are also interrelated and will be considered by us together. The *gist* of those issues is that the trial court reversibly erred in admitting Pamela's out-of-court statements that appellant would harm or kill her and her belief that appellant would take Conner away. As we have noted, a trial court's ruling on the admission of evidence is measured by an abuse of discretion standard. Its ruling should not be reversed if the ruling is within the "zone of reasonable disagreement." *See Green,* 934 S.W.2d at 101–02 (quoting *Montgomery v. State,* 810 S.W.2d 372, 379–80, (Tex.Crim.App.1990)). Moreover, there is a "state of mind" exception to the hearsay rule which is codified in Texas Rule of Evidence 803(3), That rule provides:

(3) **Then existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

In argument under this issue, appellant points out testimony the State elicited that Pamela was preparing to divorce appellant, that she believed appellant would harm or kill her, and that she believed appellant might take Conner away from her. He acknowledges that the testimony about Pamela's preparations for divorce fall within the "state of mind" hearsay exception. However, he argues, the testimony that Pamela believed Dorsey would harm or kill her or might take Conner away did not fall within the "state of mind" exception and was not admissible.

In support of his argument that reversal is required, appellant made record citations to portions of the testimony of Linda Reynolds, Pamela's work supervisor, Sherri Scarpa, a former co-employee with Pamela, Rachel Courreage, another former co-employee of Pamela, and Melvin Franklin, a Montgomery County sheriff's detective. In reviewing the portions of the record upon which appellant cites and relies, we find no testimony elicited by the State that Pamela believed appellant would harm or kill her or words to that effect. The Rules of Appellate Procedure not only require a clear and concise argument for the contentions made, they also require appropriate citations to the authorities and to the record. *See* Tex.R.App. P. 38.1(h). Appellant's failure to comply with that requirement fails to preserve that portion of his issue for appellate review.

■ With regard to appellant's threats to take Conner away from Pamela, appellant cites:

1. Ms. Reynold's testimony on November 6, 2001 that Pamela "was afraid that her husband would take Conner and run away with him and she would never see him again."

2. Ms. Scarpa's testimony on November 6, 2001, that Pamela "was fearful of her husband", and that she "was think-

ing of leaving her husband, Chad, and that Chad had told her that he would take the baby to Scotland, should she leave."

Appellant made no trial objection to that testimony of Ms. Reynolds. Texas Rule of Appellate Procedure 33.1 requires a timely and specific objection to preserve a question for appellate review. TEX.R.APP. P. 33.1. Texas Rule of Evidence 103 also provides that error may not be predicated upon a ruling admitting evidence without a timely objection or motion to strike unless the ruling is fundamental error. TEX.R. EVID. 103. Because of the lack of a timely and specific objection on the basis he now raises, appellant has failed to preserve the question for appellate review. *See Wilson v. State*, 7 S.W.3d 136, 145 (Tex.Crim.App. 1999). Although appellant had made an earlier hearsay objection to portions of Ms. Scarpa's testimony, he did not ask for, and was not granted, a running objection to her testimony. He also made no such objection to this portion of Ms. Scarpa's testimony. By failing to do so, he did not preserve the hearsay question for our review. Parenthetically, he does not argue fundamental error.

Moreover, assuming arguendo that the question was preserved for our review, because Ms. Reynolds's earlier and similar testimony had been admitted without objection, any error in the admission of the later testimony was cured. *See Ethington v. State*, 819 S.W.2d 854, 858 (Tex.Crim. App.1991) (an error in admission of evidence is cured when the same evidence comes in elsewhere without objection).

■ Additionally, in this court's earlier opinion, we held that hearsay testimony describing Pamela's fear of Dorsey was admissible to show her emotional state or "mental feeling" at the time she made such statements. *Dorsey*, 24 S.W.3d at 928. We also held that certain statements that were not reflective of Pamela's state of mind but rather were her memories of specific events were not admissible under Rule 803(3). *Id.* at 929. In *Barnes v. State*, 56 S.W.3d 221, 231 (Tex.App.-Fort Worth 2001, pet. ref'd), with citation of the decisions of numerous sister courts, including the *Dorsey* decision, the court opined that a statement that the declarant is afraid or testimony demonstrating that the declarant was afraid when the statement is made is admissible under Rule 803(3).

The testimony which led to the reversal of the first trial of this case was, in our words, "not reflective of Pamela's state of mind but instead were her memories of specific events" and thus not admissible under Rule 803(3). *Dorsey*, 24 S.W.3d at 929. In contrast, the testimony in question here, namely, that Pamela was "fearful" of her husband or was afraid he might harm her, or that he might take Conner away were not related to memories of underlying specific events but were limited to her mental impressions. As such, even had the question been properly preserved for our review, the testimony was admissible. Appellant's eleventh, twelfth and thirteenth issues are overruled.

■ In his fourteenth issue, appellant argues the trial court reversibly erred in admitting evidence of extraneous acts of appellant in violation of Texas Rule of Evidence 404(b). TEX.R. EVID. 404(b). Specifically, his complaint is about testimony elicited during the cross-examination of defense witness Stacey Hert, the couple's Amway supervisor. During her direct examination, Stacey testified that she was visiting Pamela in the Dorsey home around the end of 1995 or in early 1996. As she visited, she saw Conner climb up on a counter, pull out a gun from Pamela's purse, and hold it in both hands. She said that frightened her, she told Pamela the child had the gun, and Pamela laughed and

took the gun away from Conner and replaced it in her purse.

On cross-examination, Stacy testified that on May 9, 1996, appellant came to her house to pick up some Amway products. Stacey testified that she was familiar with the couple's relationship and it was "not a good one" and "[t]hey argued all the time." On May 9, 1996, she and appellant had a discussion about their relationship and appellant said "[t]hat he would pull the trigger first."

On redirect examination by appellant, Stacy said that she had made a remark jokingly but his response was not joking. The record then shows the following colloquy between defense counsel and the witness:

Q. What did you say to him that got that response?

A. I said to him that, "One of these days you're going to open the paper and see 'April Sound [the location of their residence] couple found dead in their home, double suicide[.]'" And then I said, "No, it will be a double homicide, whenever you see it."

Although appellant admits the statement was admissible as an admission by a party opponent, he argues it must also meet the requirements of Texas Rule of Evidence 404(b). Although that Rule excludes evidence of other crimes, wrongs, or acts introduced to prove conformity with that character, it does allow such evidence to show proof of motive, intent, opportunity, or absence of mistake or accident. In view of appellant's defense that the shooting was accidental, the testimony was clearly admissible to show the absence of mistake or accident as well as motive and intent. Moreover, statements of this nature are admissible in a murder trial under Texas Code of Criminal Procedure article 38.36(a). That article permits the State to offer testimony "as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." TEX.CODE CRIM. PROC. ANN. art. 38.36(a) (Vernon Supp.2003). Appellant's fourteenth issue is overruled.

■ In his fifteenth issue, appellant argues the trial court reversibly erred in excluding the testimony of his expert witness Dr. Rex Frank, who, he says, would have testified about Conner's motor skills ability. Dr. Franks would have testified about the average grip strength of an average two and one-half year old child and whether such a child would have the strength to pull the trigger of a gun such as the one used in the shooting. After the State's objection to his testimony was sustained, appellant's careful trial lawyers included his testimony in a bill of exceptions and we have reviewed that testimony. The bill shows that the doctor's testimony was based upon various studies and, other than viewing a video tape of the child mowing grass and the State's video we have discussed above, he had never actually seen and tested Conner nor had he personally conducted any grip strength test on any child or children actually equivalent to Conner in age and fitness.

■ Texas Rule of Evidence 702 allows the admission of expert testimony such as this if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." TEX.R. EVID. 702. Under the Rule, the proponent of the evidence must show by clear and convincing evidence that the evidence proffered is sufficiently relevant and reliable to assist the jury in that regard. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App. 2000). In addressing the admissibility of expert evidence, "the trial court's first task

is to determine whether the testimony is sufficiently reliable and relevant to help the jury in reaching accurate results." *Kelly v. State,* 824 S.W.2d 568, 572 (Tex. Crim.App.1992). Thus, "the testimony must be 'sufficiently tied to the facts to meet the simple requirement that it be "helpful" to the jury.' " *Morales v. State,* 32 S.W.3d 862, 865 (Tex.Crim.App.2000) (quoting *Jordan v. State,* 928 S.W.2d 550, 555 (Tex.Crim.App.1996)). We review a trial court's ruling on the admissibility of evidence under an abuse of discretion test and must uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Weatherred,* 15 S.W.3d at 542. Under this record, the trial court did not abuse its discretion in excluding the evidence. Appellant's fifteenth issue is overruled.

■ In his sixteenth and final issue, appellant complains of the deadly weapon finding in the trial court's judgment and asks us to reform the judgment to delete that finding. In relevant part, the indictment in this case provides:

Charles Ray Dorsey ... did then and there intentionally and knowingly cause the shooting death of an individual, namely Pamela Gale Dorsey, by shooting her.

The jury found appellant was guilty "as charged in the indictment." It made no express finding as to the use of a deadly weapon.

In *Polk v. State,* 693 S.W.2d 391, 396 (Tex.Crim.App.1985), the court instructed that a trial court may not properly enter an affirmative finding concerning the defendant's use or exhibition of a deadly weapon during the commission of the offense unless:

1) the deadly weapon or firearm has been specifically pleaded as such and the verdict reads "guilty as charged in the indictment";

2) where not specifically pleaded as a deadly weapon or firearm, the weapon pleaded is *per se* a deadly weapon or a firearm; or

3) a special issue is submitted and answered affirmatively.

In *Ex Parte Beck,* 769 S.W.2d 525, 526 (Tex.Crim.App.1989), cited by the State, the court considered an indictment which alleged that the appellant caused the death of the victim "shooting him with 'a gun.' " In the course of its discussion, the court noted that the allegation was sufficient to give the defendant *notice* that the State would attempt to prove that the named gun was used in a manner that caused death and was, therefore, a deadly weapon. *Id.* at 528. However, the court warned, had the jury in that case not answered a special issue that the gun was a deadly weapon, "there would have been no *affirmative* finding of deadly weapon made, even upon the return of a verdict of 'guilty as charged in the indictment.' " *Id.*

In *Boyett v. State,* 692 S.W.2d 512, 517 (Tex.Crim.App.1985), the court had occasion to consider an indictment that charged a death was caused "by shooting him with a gun." As relevant here, the court reiterated its previous holding that a "gun" is not a deadly weapon. *Id.* That being so, the court concluded, "the indictment in this case does not allege a deadly weapon so as to permit a verdict of 'guilty as alleged in the indictment' to be considered an affirmative finding." *Id.* It is true that the Court of Criminal Appeals has held a "pistol" is a deadly weapon *per se, see Giles v. State,* 617 S.W.2d 690, 691 (Tex.Crim.App.1981), a "firearm" is a deadly weapon *per se, see Stewart v. State,* 532 S.W.2d 349, 350 (Tex.Crim.App.1976), and a "handgun" is a deadly weapon *per se, see Dade v. State,* 622 S.W.2d 580, 581 (Tex.Crim.App.1981).

The State argues that although the indictment did not allege the specific murder weapon used in shooting Pamela, the indictment alleged a death and means related to some weapon. Thus, it concludes, the jury made an explicit finding that appellant used a deadly weapon. We disagree. While it might be argued that the use of the word "shooting" in the indictment might mean some use of a firearm, a pistol, or a hand gun, all deadly weapons *per se*, it is equally reasonable to assume that it means the use of a "gun", which is not a deadly weapon *per se*. Under the present state of the law, we can only conclude the trial court erred in making the affirmative deadly weapon finding. Appellant's sixteenth issue is sustained. That sustention requires us to modify the trial court's judgment to delete all references to the use of a deadly weapon. *See* TEX. R.APP. P. 43.2(b).

In summary, all of appellant's issues are overruled except his sixteenth issue which is granted. The trial court judgment is modified to delete all reference to the use of a deadly weapon. As modified, the judgment is AFFIRMED.

DAVID B. GAULTNEY, Justice, concurring.

I concur. But respectfully I write separately because I question the rationale of *Boyett* and the need to strike the deadly weapon finding in this murder case. *See Boyett v. State*, 692 S.W.2d 512 (Tex.Crim. App.1985).

Any object used to cause death is a deadly weapon. *See* TEX. PEN.CODE ANN. § 1.07(a)(17)(B) (Vernon 2003)("Deadly weapon" means "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury."). In a homicide involving a "shooting," the instrumentality of death is a deadly weapon, because it is something that actually caused a death. The Court of Criminal Appeals has held that an indictment charging the accused with causing death by use of any instrument is sufficient notice of the State's intent to seek a deadly weapon finding. *See Ex parte McKithan*, 838 S.W.2d 560, 561 (Tex.Crim.App.1992) (indictment alleging death caused by motor vehicle provided notice of intent to seek affirmative finding of use of deadly weapon in an involuntary manslaughter case) (citing *Ex parte Beck*, 769 S.W.2d 525, 526–28 (Tex.Crim.App.1989)). Likewise, the Court of Criminal Appeals has said that anything actually used to cause the death of a human being is a deadly weapon for purpose of supporting a jury's deadly weapon finding. *See Tyra v. State*, 897 S.W.2d 796, 798 (Tex.Crim.App.1995) (approving deadly weapon finding in involuntary manslaughter case where a driver, by reason of operating a motor vehicle while intoxicated, caused the death of an individual). In contrast, *Boyett* unequivocally held that a jury's finding—that the accused committed voluntary manslaughter "as alleged in the indictment"—could not be considered an affirmative finding of the use of a deadly weapon where the indictment alleged that the accused caused the victim's death "by shooting him with a gun." *Boyett*, 692 S.W.2d at 517. If an indictment allegation provides sufficient notice of the State's intent to seek an affirmative finding, and if the evidence will support an affirmative finding, why does that same indictment by reference in the jury's verdict not function as an express deadly weapon finding? And, as here, where the jury finds a death was caused by shooting, how can the finding be anything other than that a deadly weapon was used? But *Boyett* holds otherwise. *Id.* at 517. As an intermediate appellate court we are bound by *Boyett*. Because murder is a "3g" offense, the deadly weapon finding may seem irrelevant. *See* TEX.CODE

CRIM. PROC. ANN. art. 42.12, § 3g (Vernon 2003). But a court should not be required to strike the judgment's deadly weapon finding when the indictment says the defendant intentionally and knowingly caused the death of Pamela Dorsey by "shooting her," and the jury found defendant guilty as charged in the indictment. It seems inconsistent with reason and the cited case law to do so. I believe the holding in *Boyett* should be reconsidered.