Michael W. MORTON, Appellant,

v.

The STATE of Texas, Appellee.

No. 3-87-064-CR.

Court of Appeals of Texas,
Austin.

Dec. 14, 1988.

William P. Allison, White & Allison, P.C.,
Austin, for appellant.

Ken Anderson, Dist. Atty., Georgetown,
for appellee.

Before SHANNON, C.J., and
CARROLL and JONES, JJ.

CARROLL, Justice.

Christine Morton was beaten to death
sometime during the early morning hours
of August 13, 1986. A jury found her
husband, Michael, guilty of her murder and
assessed life imprisonment and a $5,000
fine. Tex.Pen.Code Ann. § 19.02 (1974).
We will affirm the judgment of the district
court.

## BACKGROUND

The State's view of the case can be briefly stated: Morton and his wife had a past history of conflict regarding her personal appearance and her lack of interest in sex; he had planned a romantic evening on his birthday; she rejected him; he became enraged and in a fit of sexual frustration and anger, beat her to death with a billy club, then masturbated onto the sheet next to her dead body.

Morton testified in his own defense, and his theory of the case is also easily stated: he admitted their conflict and his frustration upon her rejection, but he denied killing her. According to him, Christine was alive when he left for work and must have been killed by an unseen and unknown burglar.[1]

## THE EVIDENCE AT TRIAL

The story told by the evidence at trial is a chilling one. Shortly after noon on August 13th, a neighbor noticed the Mortons' three-year-old child wandering around outside and became concerned. The neighbor entered the house and called out to Christine. While in the house, she found a note apparently written by Morton to Christine before he left for work that day.[2] (This note was later discovered by the police and was introduced at trial.) In the master bedroom she discovered blood on the floor, and then noticed the body and called the police.

Williamson County Deputy Sheriff Wayne Lock was the first law enforcement officer on the scene. He made a preliminary search of the home and determined that the house was empty. He found the murdered woman lying in bed, covered with a quilt, with a suitcase and a laundry hamper stacked on top of the quilt. Lock promptly secured the scene and called in a report to the Sheriff's office. Additional law enforcement personnel arrived a short time later and began what Morton characterizes as a six or seven hour search of the premises without any attempt to obtain a warrant to authorize the search.

At about 3:00 that afternoon, Morton arrived at the home of the family baby sitter to pick up his son, learned that the boy had not been brought in, and called home. Williamson County Sheriff Jim Boutwell answered the phone and told Morton to return home. (Unknown to either man, their conversation was recorded on the Mortons' answering machine.) When Morton arrived at his house, Sheriff Boutwell told him of Christine's death, advised him of his *Miranda* rights and then proceeded to question him. During this questioning, Morton signed a printed form consenting to the search of his home.

According to the sheriff, Morton claimed that the previous night he had taken his family out to dinner at an Austin restaurant to celebrate his birthday. After they returned home, he first put his son to bed and then went into the living room to join his wife. He brought a condom with him, and started one of the two video tapes he had rented, "A Handful of Diamonds." He and Christine had an argument about sex, she fell asleep, so he left her in the living room and went to bed. She came to bed sometime later and apologized. Before he went to work the next morning, he wrote his wife a note which he left in the bathroom.

The restaurant's records showed the Mortons had finished eating by 9:30 p.m. Dr. Bayardo, the Chief Medical Examiner of Travis County, testified as an expert on behalf of the State. In Dr. Bayardo's opinion, Christine had been killed within four

---

1. There was some indication of a burglary. Although there was no sign of a forced entry, the back sliding glass door was unlocked, and a pistol and Christine's purse were missing. Other valuables lying in open view were not removed, however.

2. The note read: "Chris, I know you didn't mean to, but you made me feel really unwanted last night. After a good meal, we came home, you binged on the rest of the cookies, then with your nightgown around your waist and while I was rubbing your hands and arms, you farted and fell asleep. I'm not mad or expecting a big production. I just wanted you to know how I feel without us getting into another fight about sex. Just think how you might have felt if you were left hanging on your birthday."

hours after she had eaten. He based this opinion on an analysis of the stomach contents.

The State also introduced evidence of a semen stain on the sheet and a pubic hair on top of Christine's hand; both consistent with Morton's blood and hair types. Further testimony revealed that Morton slept in their bed the night after her murder (with her blood still beneath it); and that a couple of weeks after her funeral, he cut down some marigolds she had planted, about which they had argued.

## CONTENTIONS ON APPEAL

Morton raises six points of error. These points attack the legality of the 6–7 hour warrantless search of his home following the discovery of his murdered wife; the admission of the note; the sufficiency of the evidence to convict; the exclusion of what he terms admissions made by the Sheriff's office; the introduction by the State of the first two minutes of the rented video tape; and the State's failure to produce exculpatory portions of certain police reports. We will first address the legality of the search.

■ 1. *The Search of the Home.* Morton concedes that Deputy Lock's initial warrantless search was valid under the emergency doctrine. *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Bass v. State,* 732 S.W.2d 632 (Tex. Cr.App.1987). Morton strongly argues, however, that when the emergency ended —*i.e.,* when Deputy Lock determined that there were no other victims or killers present—the State was required either to obtain a warrant or to justify the search under some exception to the warrant requirement. *Mincey* at 392, 98 S.Ct. at 2413; *Thompson v. Louisiana,* 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984). We agree. However, such an exception to the warrant requirement is found here—a search authorized by consent freely and voluntarily given. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973).

Morton contends that the consent in this case was involuntary. This contention presents a question of fact to be determined from the totality of the circumstances. *Schneckloth* at 227, 93 S.Ct. at 2047– 2048. The State has the burden to prove by clear and convincing evidence that the defendant freely and voluntarily consented. *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Dickey v. State,* 716 S.W.2d 499, 504 (Tex.Cr. App.1986). The fact that a person is held in custody does not preclude a finding of free and voluntary consent, but is one of the factors which must be considered. *Nastu v. State,* 589 S.W.2d 434 (Tex.Cr. App.1979), *cert. denied,* 447 U.S. 911, 100 S.Ct. 3000, 64 L.Ed.2d 862 (1980); *Paprskar v. State,* 484 S.W.2d 731, 737 (Tex.Cr. App.1972).

Here the question of voluntariness is not difficult. Morton was not in custody; rather, he was in his own home, under no restraint, and could have discontinued the questioning at any time. Further, at trial he admitted that he consented to the search and that he voluntarily gave both blood and hair samples to the police. Accordingly, we find Morton's oral statement and his consent to the search were given voluntarily.

The more difficult question here is whether the voluntary consent which Morton gave some 3 or 4 hours after the warrantless search began "cured" any existing illegality. Although no Texas case addresses this issue, we believe that such consent *would cure* any preexisting illegality under the reasoning found in *United States v. Carson,* 793 F.2d 1141 (10th Cir. 1986), *cert. denied,* 479 U.S. 914, 107 S.Ct. 315, 93 L.Ed.2d 289 (1986). We need not make that determination, however.

■ Instead we have examined each of the individual pieces of evidence Morton challenges on appeal under the supposition that the consent *was involuntary* so that the search *was illegal.* We have concluded that any error in the district court's admission of these items of evidence was either waived or harmless.

*a. The answering machine tape.* When the State offered the audio tape into

evidence, the attorney for Morton stated: "No objection," and thus waived any error in the admission of the tape. *See, e.g., Moraguez v. State,* 701 S.W.2d 902 (Tex.Cr. App.1986).

b. *Oral statements made to Sheriff Boutwell.* At trial, Sheriff Boutwell testified that during the questioning at Morton's home on the day of the murder, Morton asked whether his .45 automatic pistol was missing; whether his wife was shot or beaten; and stated that he and his wife had watched a rented video tape of the movie, "A Handful of Diamonds." Before trial, Morton unsuccessfully sought to suppress Sheriff Boutwell's testimony concerning the oral statements on the basis that the statements were *involuntary.*

Although the basis for his motion to suppress was that the statements were involuntary, in his brief on appeal he challenges the admission of Sheriff Boutwell's testimony on a different basis—that the statements were the fruits of an illegal search. Because this contention was not presented to the trial court, it was not preserved for review. Tex.R.App.P.Ann. 52(a) (Supp. 1988).

c. *Introduction of video tape.* At trial, the State introduced the first two minutes of a video tape of the movie "A Handful of Diamonds." (This movie was referred to at trial as "sexually explicit" and deserves the description). Morton complains (1) that the basis for the introduction of the tape was his involuntary statement to Sheriff Boutwell that he and his wife had watched the tape, and (2) that the tape was found during the illegal search of his home. He further argues that since the district court erroneously admitted Sheriff Boutwell's testimony, Morton was impelled to testify to that effect at trial.

We have already concluded that Morton's oral statements were not involuntary, so the Sheriff's testimony was properly admitted, and Morton's testimony was not impelled. Thus, the basis for the video tape's admission was proper. As to his contention that the tape was found during an illegal search, the officers did not seize the tape during the search. Instead, the officers later rented the *same* tape from the *same* video shop.[3] So even had the search been illegal, the video tape could not have been a fruit of that search.

d. *Morton's note to his wife.* Morton argues that the note was inadmissible under Tex.Code Cr.P.Ann. art. 18.02(10) (Supp.1988), which prohibits the issuance of a search warrant for so-called personal writings, and that the note was also the fruit of an illegal search. The note was not found in a search pursuant to a warrant, so article 18.02(10) is inapplicable. Furthermore, we believe any error in admitting the note into evidence was harmless.

■ The test for harmless error is "whether there is a reasonable probability that the complained of evidence might have contributed to the conviction or the punishment assessed." *Green v. State,* 727 S.W. 2d 263, 267 (Tex.Cr.App.1987). *See also* Tex.R.App.P.Ann. 81(b)(2) (Supp.1988). We consider the facts and circumstances of the individual case in determining whether an error is harmless. Evidence of Morton's guilt included Dr. Bayardo's testimony concerning the time of death, the arguably faked burglary scene, testimony about the Mortons' arguments about sex, testimony that Morton slept in the bed the night after her murder, that he cut down marigolds she had planted, evidence of a semen stain on the sheets and a pubic hair on Christine's hand consistent with Morton's blood and hair types.

Although the State characterized the note as a confession (because it describes the nightgown as being up around Christine's waist, which is how the body was found), the note was also consistent with Morton's defense. We thus find there is not a reasonable probability, in light of the other evidence, that it contributed to Morton's conviction or punishment.

■ 2. *The Sufficiency of the Evidence.* Morton urges in his third point that the State did not prove sufficient circum-

---

3. Morton had provided these details during his oral statement to the Sheriff. The video tape is thus the "fruit of his oral statement" not of the search of his home.

stantial evidence that Morton was present when his wife was killed. In determining the sufficiency of the evidence to support a criminal conviction, we view the evidence in the light most favorable to the verdict and then determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1974); *Carlsen v. State,* 654 S.W.2d 444, 448 (Tex.Cr. App.1983) (opinion on rehearing). In circumstantial evidence cases, the same standard for review is applied: "a process of elimination must be used ... if the evidence supports an inference other than the guilt of appellant, a finding of guilty beyond a reasonable doubt is not a rational finding." *Freeman v. State,* 654 S.W.2d 450, 456 (Tex.Cr.App.1983) (opinion on rehearing).

The evidence at trial showed that Morton and his family finished eating his birthday dinner at 9:21 p.m. on August 12th; that Morton was at home with Christine until he left for work at 5:30 a.m. on August 13th; that based on the expert opinion of Dr. Bayardo, Christine was killed within four hours after her last meal. Dr. Bayardo based his opinion on the autopsy he had performed and on his analysis of the stomach contents. Morton's expert witnesses testified that an estimate of time of death based on stomach contents was unreliable, but did not otherwise contradict Dr. Bayardo's opinion. The jury was free to believe either expert. *Wicker v. State,* 667 S.W.2d 137, 142 (Tex.Cr.App.1984). Obviously, the jury chose to believe Dr. Bayardo. Furthermore, the other circumstantial evidence the State presented also supports a finding of guilty beyond a reasonable doubt.

■ 3. *Admission by State.* Morton complains in his fourth point that the court erred in refusing to allow Morton's investigator to testify that the Sheriff's Chief Investigator told him the estimated time for Christine's death was between 1:00 and 6:00 a.m. Tex.R.Cr.Evid.Ann. 801(e)(2)(D) (Supp.1988). Morton complains this testimony would have opened the possibility that Christine was murdered at a time af-

ter Morton had left for work at 5:30 a.m. Morton argues that since the Chief Investigator was an agent of the State, his statement was admissible under the rule that a statement is not hearsay if it is an admission by a party-opponent or a statement by his agent. No Texas cases have construed police investigators or officers as agents of the State under Rule 801(e)(2)(D). One court, however, concluded that a state auditor was an agent of the State under the comparable civil rule. *State v. Buckner Const. Co.,* 704 S.W.2d 837, 846 (Tex.App. 1985, writ ref'd n.r.e.).

Without holding that the Chief Investigator was an agent of the State under Rule 801, we find no harm because Dr. Bayardo, the State's forensic expert, testified on cross-examination to the same thing: that his initial estimate of the time of death was between 1:00 and 6:00 a.m., and it was Dr. Bayardo's estimate which was the source of the Chief Investigator's statement to Morton's investigator.

■ 4. *The Video Tape.* In his fifth point of error Morton again challenges the admissibility of two minutes of the videotape, "A Handful of Diamonds," this time on the basis that its probative value was substantially outweighed by the danger of unfair prejudice. Tex.R.Cr.Evid.Ann. 401, 402, 403 (Supp.1988); Tex.Pen.Code Ann. § 19.06 (1974). For an extraneous transaction to be admissible the State must show that it is relevant to a material issue in the case and that its relevancy outweighs its prejudicial impact. *Williams v. State,* 662 S.W.2d 344 (Tex.Cr.App.1983). To fall under the extraneous transaction rule "the extraneous matter need not constitute an *offense." Brandley v. State,* 691 S.W.2d 699, 705 (Tex.Cr.App.1985). We will first address the relevancy question.

The State offered the video tape as evidence of Morton's motive in murdering his wife and staging a faked burglary. The trial court admitted only the two-minute introduction or "leader" of the movie. This short segment is sexually explicit; it contains sex scenes between a burglar who breaks into a house and the woman who lives there. The court ruled that the por-

tion of the video tape was some evidence of Morton's motives of being sexually frustrated and of covering up the murder as a burglary. We agree that the fragment of the video tape was relevant: "[t]he prosecution may always offer evidence ... to show motive for the commission of an offense" as long as that evidence "fairly tend[s] to raise an inference in favor of the existence of a motive." *Rodriguez v. State*, 486 S.W.2d 355, 358 (Tex.Cr.App. 1972).

The two-minute segment of the video tape fairly tended to raise an inference in favor of Morton's sexual frustration motive, which was supported by other evidence such as an unopened condom package Morton left on the living room floor, a semen stain consistent with Morton's blood type next to the body; Morton's pubic hair found on top of the victim's hand; the victim's body found with no panties on and the nightgown pulled up around the waist; and the note to Christine.

We agree with the trial court that the relevance of the video tape to the burglary motive is not as probative as it is to the sexual motive, but it is nevertheless some evidence of the burglary motive as well.

Morton strongly challenged the prejudicial impact of the video tape. Although it is a close call, we agree that the probative value outweighed its potential prejudicial effect State showed only the first two minutes of the hour-and-a-half video tape, and the court excluded all of the second sexually explicit video tape which Morton had rented. Furthermore, this is a circumstantial evidence case and the probative effect of establishing a motive for a husband to have brutally beaten his wife to death outweighs the prejudice which showing two minutes of the video tape might have produced. We therefore overrule Morton's fifth ground of error.

■ 5. *Brady Material.* In his sixth point Morton claims the State withheld exculpatory material in violation of his right to due process. Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the State violates due process when it withholds exculpatory material or material which would reduce the penalty. The material Morton complains about is the field notes of the Chief Investigator, Sgt. Wood. The trial court inspected, sealed, and ruled that the notes contained no *Brady* material. After examining the notes, we have determined that the trial court was correct—they contain no exculpatory material.

Morton also complains that there is a possibility Sgt. Wood did not turn over all his notes. According to Morton, the sheaf of notes appeared thicker at an earlier hearing than when finally produced for the court. However, there is no evidence in the record to support this contention. Because we have nothing more to consider than a mere possibility raised by Morton, we reject this complaint.

CONCLUSION

We overrule Morton's six points of error and affirm the judgment of the trial court.