# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00585-CR

### In re Michael Wayne Morton

### FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 26TH JUDICIAL DISTRICT NO. 86-452-K26, HONORABLE BILLY RAY STUBBLEFIELD, JUDGE PRESIDING

## O P I N I O N

In 1987, appellant Michael Wayne Morton was convicted of the murder of his wife Christine Morton, and was sentenced to life imprisonment. In 2005, pursuant to chapter 64 of the Texas Code of Criminal Procedure, appellant filed a motion for forensic DNA testing of evidence containing biological material that appellant believes may undermine the basis for his conviction. The district court denied, in part, appellant's motion for DNA testing. Appellant appeals the district court's denial of certain testing. We affirm the district court's order as to the evidence collected in connection with a separate, but similar, murder because such evidence was not secured in relation to Christine's murder as required by chapter 64. We further affirm the order as to the fingerprint evidence at issue because such evidence does not contain biological material as required for an order under chapter 64. However, we reverse the district court's order as to the blood-stained bandana recovered from behind the Mortons' house because appellant has established by a preponderance of the evidence that he would not have been convicted if exculpatory results were

obtained through such testing. We remand the cause to the district court for further proceedings consistent with this opinion.

*Factual and Procedural Background*

Shortly after noon on Wednesday, August 13, 1986, Michael and Christine Morton's next-door neighbor noticed the Mortons' three-year-old son Eric alone outside the Mortons' house. The neighbor entered the Morton home to look for Eric's mother Christine and eventually discovered her dead body in the master bedroom. The body was under a comforter on the bed, and a wicker basket and suitcase were piled on the body at the headboard. Christine had suffered a massive blunt injury to the head caused by at least eight blows. Her entire upper body was covered in blood. After an autopsy, the medical examiner identified a defense-type injury on Christine's left little finger and an abrasion on her right little finger, and collected a number of wood chips found embedded in her head and hair.

At the time Christine's body was discovered, appellant was at his workplace. The State prosecuted appellant under the theory that he had killed his wife "in a sexual rage" the night before her body was discovered when she refused to have sex with him. Appellant adamantly denied he had killed his wife and pointed to evidence that after he had left for work at 5:30 a.m. an unknown killer entered the house, which evidence included overturned drawers in the bedroom and appellant's handgun and Christine's purse missing from the house. The State countered that appellant purposefully attempted to make the murder appear to have been committed by an intruder. The jury found appellant guilty, and on February 23, 1987, appellant was sentenced to life imprisonment.

This Court affirmed the judgment of the district court. *See Morton v. State*, 761 S.W.2d 876 (Tex. App.—Austin 1988, pet. ref'd).

On February 11, 2005, appellant filed in the district court a motion for forensic DNA testing of evidence related to Christine's murder, pursuant to chapter 64 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 64.01(a) (West Supp. 2009). Appellant sought testing of the following: (1) vaginal, oral, and rectal swabs collected from Christine's body at her autopsy, hairs found entwined in her right hand at the crime scene, fingernail clippings taken from her hands, and the nightgown recovered from her body; (2) a blood-stained bandana recovered from behind the Mortons' house;[1] (3) certain biological material collected from Mildred McKinney, who was the victim of a murder that occurred in the Mortons' neighborhood approximately six years before Christine's murder; and (4) fingerprints recovered from both the McKinney and Morton crime scenes for purposes of comparative analysis. The district court, on August 8, 2006, ordered that DNA testing be performed on the first category of evidence, but denied appellant's motion with regard to the bandana. In a separate order signed on July 24, 2008, the district court also denied appellant's motion with regard to the McKinney biological evidence and the fingerprint evidence.[2]

On March 7, 2008, after the ordered DNA testing proved inconclusive—except that testing of the hairs yielded DNA profiles consistent with appellant and Christine—the district court

---

[1] Appellant's request for testing of the bandana includes both the bandana itself and a strand of hair found on the bandana.

[2] After the district court entered its findings on the first category of evidence and the bandana, appellant filed a petition for writ of mandamus in this Court to compel the district court to enter a ruling with respect to the McKinney biological evidence and the fingerprint evidence. This Court conditionally granted appellant's petition. *See In re Morton*, No. 03-08-00203-CV (Tex. App.—Austin June 6, 2008, orig. proceeding).

3

entered findings on appellant's motion. *See id.* art. 64.04 (West 2006). The district court found that, had the results of the testing been available during the 1987 trial, it is not reasonably probable that appellant would not have been convicted of the offense of murder.

Appellant appeals the district court's denial of his motion for forensic DNA testing with respect to the blood-stained bandana, the McKinney evidence, and the fingerprint evidence.

### *Texas Code of Criminal Procedure Chapter 64*

Under Texas Code of Criminal Procedure chapter 64, a convicted person may submit to the convicting court a motion for forensic DNA testing of evidence containing biological material. *Id.* art. 64.01(a). To order testing, the court must first find that identity was or is an issue in the case. *See id.* art. 64.03(a)(1) (West Supp. 2009). Moreover, the convicted person must establish by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing, and that the request for the proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice. *Id.* art. 64.03(a)(2).

To qualify for forensic DNA testing, the evidence must have been secured in relation to the offense that is the basis of the challenged conviction and have been in the possession of the State during the trial of the offense. *See id.* art. 64.01(b). The evidence must still exist, must be in a condition making DNA testing possible, and must have been subjected to a chain of custody sufficient to establish that it has not been substituted, tampered with, replaced, or altered in any material respect. *Id.* art. 64.03(a)(1)(A). Other requirements apply depending upon whether the evidence has been previously subjected to DNA testing. *See id.* art. 64.01(b)(1), (2).

4

In the event that testing is ordered, after the results have been examined the convicting court must hold a hearing and make a finding as to whether, had the results been available during the trial of the offense, it is reasonably probable that the person would not have been convicted. *See id.* art. 64.04.

The convicted person may appeal the trial court's orders and findings. *See id.* art. 64.05 (West 2006). In reviewing the trial court's decisions on a motion for forensic DNA testing, we afford almost total deference to the court's determination of issues of historical fact and application-of-law-to-fact issues that turn on credibility and demeanor. *See Rivera v. State*, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002). We review de novo all other application-of-law-to-fact issues. *Id.*

### The Bandana

Following the discovery of Christine's body, a law enforcement officer found a bandana approximately one hundred yards northeast of the rear of the Mortons' house, on the edge of a curb, at the front of a home construction site. A wooded tract of land separated the two sites. The officer noted the discovery in a report, but did not collect the bandana. Christine's brother went to the site, collected the bandana, and turned it over to the State. The bandana appeared to have blood stains on it. After the State secured the evidence, a Texas Department of Public Safety serologist confirmed that the bandana was, in fact, stained with human blood. However, the blood could not be further typed using the technology available at that time.

Appellant seeks to have DNA testing performed on the blood-stained bandana using new technology that might provide additional information. Appellant contends that the district court erred in denying his motion for DNA testing with respect to the bandana.

*Timeliness of notice of appeal*

The denial of a motion seeking forensic DNA testing is an appealable order. *See In re Johnston*, 79 S.W.3d 195, 197 (Tex. App.—Texarkana 2002, orig. proceeding). Appellant filed his notice of appeal after the district court entered its July 24, 2008 order denying appellant's request for DNA testing of the McKinney evidence and the fingerprint evidence, and completing its rulings on appellant's request for relief under chapter 64. The State contends, however, that appellant failed to file a timely notice of appeal as to the August 8, 2006 order denying the portion of appellant's request for DNA testing relating to the bandana. Generally, the notice of appeal must be filed within 30 days after the trial court's judgment is signed. *See* Tex. R. App. P. 26.2(a).

In *Swearingen v. State*, the court of criminal appeals held that the trial court's order denying a motion for DNA testing triggered the 30-day deadline for a notice of appeal, regardless of the trial court's subsequent denial of the convicted person's motions for an evidentiary hearing and for entry of order. 189 S.W.3d 779, 780-81 (Tex. Crim. App. 2006). However, in *Swearingen*, the denial of the motion for DNA testing decided the proceeding's outcome and triggered the running of the expiration of the trial court's plenary power. *See id.* at 781. In this case, the district court's August 8, 2006 order denied appellant's motion for DNA testing only in part, as the court ordered that some of the evidence requested by appellant be tested and did not rule on the remaining evidence at that time. The chapter 64 proceeding's outcome was not decided until the court had entered both

6

the March 7, 2008 order, which set out findings on the results of the DNA testing as to the granted portion of appellant's motion, and the July 24, 2008 order, which denied appellant's motion with respect to the remaining evidence.

We do not read chapter 64 of the code of criminal procedure to require a separate notice of appeal for each of the three orders in this case. *See Ex parte Soffar*, 143 S.W.3d 804, 805 (Tex. Crim. App. 2004) (deeming avoidance of piecemeal litigation a legitimate concern). Instead, we hold that in a chapter 64 proceeding the *final* order that denies forensic DNA testing, *see* Tex. Code Crim. Proc. Ann. art. 64.03(a), or that makes the required findings following the granting of DNA testing, *see id.* art. 64.04, triggers the running of the notice-of-appeal deadline as to all such orders in the proceeding.[3] *See In re Johnston*, 79 S.W.3d at 197 (finding denial of motion for testing to be appealable order when it is "obviously not interlocutory"). In this case, then, the appellate timetable as to the testing of the bandana ran from July 24, 2008. Appellant's notice of appeal was timely.

*Consideration of intervening evidence*

Before determining appellant's entitlement to DNA testing, we address what evidence is at issue in our review. Appellant refers to two key conclusions made by the State's medical experts at trial and contends that more recent developments have called those conclusions into question.

---

[3] In the event that a trial court fails to enter one of these two types of orders, as occurred in this case, mandamus is an appropriate remedy. *See id.*; *In re Johnston*, 79 S.W.3d 195, 197-98 (Tex. App.—Texarkana 2002, orig. proceeding).

7

A forensic analyst testifying for the State described a stain on the bed sheets as containing appellant's semen but no vaginal contributions. The State argued that this analysis indicated that after appellant beat his wife to death he masturbated over the bed. In 1991, the district court ordered testing of the sheet, but the laboratory was unable to fully test the material in the stain. When DNA testing was conducted on the stain once more in 2000 with improved techniques, it was determined that appellant could not be eliminated as the source of the spermatozoa, but also that the stain in the bed sheet contained both spermatozoa and the epithelial cells from a female. This was inconsistent with the State's theory of masturbation.

In addition, Dr. Roberto Bayardo, the Travis County chief medical examiner, testified at the 1987 trial that based on his analysis of Christine's stomach contents, she died no later than 1:15 a.m. In appellant's motion for forensic DNA testing filed in 2005, appellant attached the affidavit of Dr. Michael Baden, a former chief medical examiner of New York City. After reviewing the relevant expert testimony, Christine's autopsy and toxicology reports, and other evidence in the case, Dr. Baden concluded that the evidence did "not permit an accurate and reliable estimation, to any reasonable degree of scientific certainty, as to when Christine Morton died and whether her death occurred before or after 5:30 a.m."—the time at which appellant left the house.

The State argues, however, that we must limit our analysis to the evidence presented at trial, and cannot consider the more recent developments as to that evidence. We agree with the State that in determining whether DNA testing should be ordered, we generally look at the record at the time of the conviction. *See* Tex. Code Crim. Proc. Ann. art. 64.03(a)(2); *Smith v. State*, 165 S.W.3d 361, 364 (Tex. Crim. App. 2005) (appropriate inquiry assumes that exculpatory

8

DNA test results had been available at trial).  However, the new evidence relating to the composition of the semen stain on the bed arose in the context of DNA testing.  If two separate results of DNA testing would be sufficient to overturn a conviction, but neither would independently, it would be unreasonable not to overturn the conviction solely because the defendant made separate requests. In a second request for DNA testing, to require a defendant to re-submit evidence for testing when that evidence has already been found exculpatory—albeit insufficient by itself to reverse a conviction—would be equally unreasonable.  *See* Tex. Code Crim. Proc. Ann. art. 64.01(b)(2) (authorizing already-tested evidence to be subjected to new testing only if results would be more accurate and probative than previous results).

We hold, therefore, that when a defendant obtains exculpatory results as a result of court-ordered DNA testing, those exculpatory results may be considered when conducting a chapter 64 analysis with respect to subsequent requests for DNA testing of other evidence in the case.  Consequently, while we decline to consider appellant's post-trial evidence that relates to the timing of Christine's digestion and to which the State has not conceded for the purposes of a chapter 64 inquiry, our analysis will take into account the post-trial DNA evidence indicating that the semen stain in the bed sheet was not the result of masturbation.

*Likelihood of exculpatory results*

Under appellant's theory of the case, an unknown intruder entered the Mortons' residence through a sliding door, in the morning, after appellant had left for work.  Appellant points to the sliding door found unlocked, the wooded area behind the house where an intruder could enter the Mortons' yard without being seen, a footprint found in the backyard that the intruder could have

9

left, unidentified fingerprints in the house, and the discarded, blood-stained bandana at the construction site on the other side of the wooded area. According to appellant, DNA testing of the bandana would be exculpatory in the event that the bandana contains Christine's blood, a third party's DNA (due to blood, sweat, or hair), and none of appellant's DNA.

The State contends that it is unlikely that testing of the bandana would lead to such an exculpatory result. First, the police officer who initially discovered the bandana was of the opinion that it had been lying at that site for some time.[4] Second, the State questions how the bandana could be a crucial piece of evidence when neither the State nor the defense introduced it as evidence during appellant's trial. Third, the State refers to the unlikelihood of appellant's theory of an intruder, as there were no signs of sexual assault, numerous valuable items in the house were left intact, and no blood was found in the house outside the master bedroom.

However, it is not our task to determine the likelihood that DNA testing will obtain results that are exculpatory. Rather, our task under code of criminal procedure chapter 64 is to determine whether a defendant would have been convicted in the event that the results *are* exculpatory. *See id.* art. 64.03(a)(2). For purposes of this inquiry, we assume that the results of the DNA testing would prove favorable to appellant. *See Routier v. State*, 273 S.W.3d 241, 257 (Tex. Crim. App. 2008).

---

[4] Even if the officer's assessment were correct, however, we note the possibility that an intruder who escaped through the wooded area might have picked up a bandana discarded at the site in order to wipe blood off himself.

*Likelihood of no conviction if exculpatory results obtained*

A convicting court may order forensic DNA testing under code of criminal procedure chapter 64 only if the convicted person establishes by a preponderance of the evidence that the person would not have been convicted if exculpatory results had been obtained through DNA testing. *See* Tex. Code Crim. Proc. Ann. art. 64.03(a)(2)(A). Appellant contends that DNA testing of the bandana could obtain exculpatory results. Appellant alleges that testing of the bandana could demonstrate that the bandana contains Christine's blood, a third party's DNA, and none of appellant's DNA. Therefore, we must determine whether there is greater than a 50% chance that appellant would not have been convicted if DNA testing demonstrated that the bandana contains the exculpatory results alleged by appellant. *See Prible v. State*, 245 S.W.3d 466, 467-68 (Tex. Crim. App. 2008).

According to the evidence at trial, at the time of Christine's death, the Mortons had been married for seven years. Three-year-old Eric was their only child. The Mortons had moved to Williamson County and lived in the house for about a year prior to the murder. On the evening of August 12, 1986, the family celebrated appellant's birthday with dinner at a restaurant. After putting their son to bed, the Mortons began watching an adult video. Appellant retrieved a condom and began rubbing Christine's hand, when she fell asleep.

The State argued at trial that appellant murdered Christine in a sexual rage after she fell asleep during foreplay.[5] There was evidence at trial that appellant and Christine frequently

---

[5] To support this theory, the State relied in part on the "semen stain" in the bed sheet and argued that appellant masturbated on the bed after killing Christine. As discussed above, subsequent testing indicates that the stain contained female epithelial cells and, therefore, was not the result of appellant's masturbating.

had verbal disagreements about a variety of topics, and that appellant felt Christine did not engage in sexual relations with him with sufficient frequency. However, there was also testimony that the marriage was one of "equals," and that their relationship was often marked by joking and banter that was described as playful. There was no testimony to indicate that appellant was prone to threatening or acting violently toward his wife.

Crime scene personnel found a note in the bathroom, written by appellant, stating as follows:

> Chris—I know you didn't mean to—but you made me feel really unwanted, last night. After a good meal, we came home; you binged on the rest of the cookies. Then with your nightgown around your waist and while I was rubbing your hands and arms—you farted and fell asleep. I'm not mad or expecting a big production. I just wanted you to know how I feel without us getting into another fight about sex. Just think how you might have felt if you were left hanging on your birthday. I L Y—M

The State argued that this note was calculated to make it appear that Christine was still alive when appellant left for work.

Appellant argued at trial that an unknown intruder could have entered the Mortons' home without being seen by traveling on a pathway along the densely wooded area adjacent to the house, into the fenced-in backyard, and through one of the house's sliding doors. Investigators at the crime scene noted that a sliding glass door at the back of the house was unlocked. Approximately fifteen latent fingerprints from the crime scene were found that did not belong to the Mortons, including two collected from the frame of the unlocked sliding glass door. In addition, an unidentified footprint was found in the yard by the back fence.

The State sought to discredit appellant's theory of an intruder. While Christine's purse and one of appellant's handguns were missing, other items of value—including cameras, jewelry, and other firearms—were undisturbed. Despite the existence of splattered blood on the bedroom's walls, floor, and doorway from Christine's bludgeoning, there was no blood in the house outside the master bedroom. The State alleged that the footprint came from the funeral director's gurney carrier.

The State introduced evidence of appellant's apparent lack of surprise from the murder. Upon arriving at the babysitter's house after work to pick up his son and being informed that his son was never dropped off that day, appellant called home. When he spoke with Sheriff Jim Boutwell over the phone, appellant said he would be there in ten minutes but did not ask why the sheriff was there. Upon arriving at the house, appellant's first words to the sheriff concerned only whether Eric was okay. When the sheriff told appellant that Christine was dead, appellant asked if it was murder. When appellant provided the sheriff with details related to the weapons he possessed, he asked if his handgun was missing.

However, other testimony provides some justification for these comments. Immediately after being told his son was fine, appellant asked about his wife. Appellant testified that he asked about Eric first because he knew something was wrong with his wife since she had failed to drop Eric off at the babysitter and yet had not called him that day. Appellant attributed his question about murder to the facts that numerous investigators were in the house and yard and he was read his Miranda rights. He also testified that his asking about the handgun was in response to the sheriff's asking only about that gun after appellant had listed to the sheriff each of the guns

13

in the house. Despite the State's theory that appellant had brutally murdered his wife and worked to disguise his crime, a few hours before clocking in at work, two co-workers at appellant's workplace testified that he did not seem tired and did not exhibit any unusual or strange behavior that morning at work.

The State also relies on evidence of appellant's apparent lack of grief following the murder. The sheriff who interviewed appellant testified that he did not display any visible emotion upon learning of his wife's death. The State notes that within a few days after the murder, appellant slept in the bed in which Christine had been murdered, and he dug up some marigolds that she had planted in the front yard and about which they had argued. However, a friend of appellant's testified that when he visited the night of August 14 appellant cried with him, and that appellant showed emotion at Christine's funeral as well.

Dr. Bayardo testified that, based on the contents of Christine's stomach, her death occurred no later than 1:15 a.m. on August 13, which was before appellant left for work at 5:30 a.m. However, Dr. Bayardo admitted that this was "not a scientific statement" and that he had originally assessed the time of death in the range of 1 a.m. to 6 a.m. Excerpts from multiple books on forensic pathology were read during his cross examination stating that stomach contents were a poor indicator of time of death. Moreover, the defense presented two forensic experts, each of whom testified based on their own experience and the relevant scientific literature on stomach-emptying times that Dr. Bayardo's conclusion had no scientific basis. According to both experts, Christine could have been killed after appellant left for work.

14

The murder weapon was never found. Appellant owned a billy club, and wood chips were found in appellant's car. However, the wood chips found in appellant's car did not match the wood chips found embedded in Christine's head and hair, and there was testimony to the effect that a billy club would not have disintegrated in the fashion that occurred in Christine's murder.

Seeking DNA testing on the bandana, appellant relies on *Routier v. State*, in which the defendant was convicted of stabbing her child to death. *See* 273 S.W.3d at 244. In *Routier*, a tube sock was recovered in an alley behind, and a few houses down from, the defendant's house where her two sons were killed. *See id.* at 249. The defendant filed a chapter 64 motion to have tested, among other items, a blood stain on the sock that had been tested before the 1996 trial but did not yield any result at that time. *See id.* at 250-51. The court of criminal appeals held that the defendant's request satisfied article 64.03(a)(2)(A) because blood from an unknown third party would place that party at the scene at the time of the killings and would support the defendant's theory of an "unknown intruder" committing the crimes. *See id.* at 257-59.

This case is similar to *Routier* in that each defendant argued the existence of an unknown intruder and the State in both cases argued that the defendant committed the murder and staged the crime scene to give the appearance of an intruder. *See id.* at 258-59. While in *Routier* the item of clothing found a short distance from the house was already known to contain the victim's blood, *see id.* at 249, and thus was clearly connected to the crime, appellant in this case should have the opportunity to determine by DNA testing *both* whether the bandana contains Christine's blood and thus is connected to the crime and whether it contains a third party's DNA. *See id.* The State argues that we should reach a different conclusion than that reached in *Routier* because in this

15

case "there is no trail of items leading from the epicenter of the crime to a remote location." However, we must assume that the results of the DNA testing would prove favorable to appellant. *See id.* at 257. If the bandana contains Christine's blood, it is sufficient by itself to establish a trail. Moreover, the State's argument ignores the unidentified fingerprints and footprint on the trail between the "epicenter of the crime" and the "remote location" where the bandana was found.

The jury in this case was confronted with two conflicting theories of how Christine was murdered, each dependent on circumstantial evidence. There was conflicting testimony on the time of death. There was also conflicting testimony as to whether appellant showed the type of surprise and grief from the crime that one might reasonably expect from an innocent husband. However, there were factors that belied appellant's guilt. Appellant did not act in an unusual manner during the period of time between allegedly killing his wife and being informed that his wife was dead, and he cooperated with the murder investigation. Moreover, the Mortons' three-year-old son was left alone in the house such that he might find the dead body of his mother (in fact, at some point after the murder, he apparently had touched the suitcase on top of the body). If appellant left for work when his wife was already dead, it is arguably unlikely that he would leave the scene in a manner that his three-year-old son be left unattended and might find the body. Appellant's note in the bathroom contained details that one generally would not want made public and that referenced the very rejection that the State used as his motive at trial. If appellant were in fact the murderer and was attempting a cover-up, one would expect him to have written a more innocuous and less candid note.

16

If, then, the bandana were found to contain Christine's blood and the DNA of a person other than appellant, we think that adding this DNA evidence, which corroborates appellant's theory of an unknown intruder, could have influenced the jury's verdict in appellant's favor. The third party's DNA would be compelling evidence of a perpetrator other than appellant. At trial, to support his theory of an unknown intruder, appellant had to rely primarily on an unlocked door, unidentified fingerprints, one unidentified footprint, and his own denial of guilt. A bandana stained with Christine's blood and containing another person's DNA, discovered across the wooded area from the Mortons' house, would provide direct support for appellant's theory that the murderer escaped through the sliding glass door, over the backyard fence, and along the path through the wooded area. We recognize that such exculpatory results would not prove appellant's actual innocence. It would remain a possibility, for instance, that after killing his wife that night, appellant himself went to the construction site, retrieved the bandana from the site, brought it into the master bedroom to place Christine's blood on it, and then returned it to the site. However, considering all the evidence, we conclude that there is greater than a 50% likelihood that the jury would have harbored a reasonable doubt as to appellant's being the murderer.

***Biological Evidence from the McKinney Murder***

On November 4, 1980, approximately one-half mile from the Mortons' future home, a 73-year-old woman named Mildred McKinney was murdered in her home. McKinney had been beaten, strangled, and raped in her bedroom, and blood had splattered to the ceiling above the headboard of the bed where she had been beaten. A chair and end table were stacked on top of her

17

head and chest, and a bloody fingerprint was left on an unlocked sliding glass door. The home had been ransacked, and no murder weapon was found at the scene.

At the time of appellant's trial, an indictment against a suspect in the McKinney murder was pending, and that murder was not raised at appellant's trial. Subsequent to appellant's conviction for Christine's murder, however, it was determined that the suspect was not in Texas at the time of the McKinney murder, and according to the State the investigation into that murder remains "ongoing and active."

In his chapter 64 motion, appellant sought the inspection, analysis, and DNA testing of biological evidence collected from the scene of the McKinney murder, including any genital swabs/smears from her "rape kit," hair samples, and fingernail clippings. Appellant wants the results of such testing compared to the evidence from the Morton crime scene in hope of identifying a single perpetrator of both crimes, and he also suggests that the results could lead to a perpetrator of the McKinney murder who eventually confesses to Christine's murder as well.

Article 64.01(b) of the code of criminal procedure requires that evidence that is subject to a motion for forensic DNA testing be "secured in relation to the offense that is the basis of the challenged conviction." Tex. Code Crim. Proc. Ann. art. 64.01(b); *see also State v. Patrick*, 86 S.W.3d 592, 594-96 (Tex. Crim. App. 2002) (finding absence of jurisdiction to order DNA testing when chapter 64 requirements not met). Appellant contends that the McKinney evidence satisfies the statute's "in relation to" language, either because DNA testing could scientifically prove that the murders are related, or because the facts of the two murders—even prior to DNA comparisons—are "disturbingly similar."

18

When construing a statute, we begin with its plain language. *See Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991) ("[W]e necessarily focus our attention on the literal text of the statute in question and attempt to discern the fair, objective meaning of that text at the time of its enactment."). Under the plain language of article 64.01(b), in order for appellant's motion for DNA testing to be granted, the evidence must have been "secured in relation to" Christine's murder. *See* Tex. Code Crim. Proc. Ann. art. 64.01(b). Appellant's construction of this statutory phrase ignores the word "secured." Regardless of the extent to which the McKinney murder might *relate* to Christine's murder, appellant cannot have any evidence from the former crime tested unless such evidence was *secured* in relation to the latter crime—the offense that is the basis of the challenged conviction. *See id.* Evidence from the McKinney murder does not satisfy this statutory requirement.[6]

---

[6] Our review of the legislative history of Texas Code of Criminal Procedure chapter 64 provides support for this statutory construction. We have found no discussion of the phrase at issue—"secured in relation to"—during the relevant legislative committee hearings or floor debates. However, we note that other states had enacted statutes relating to post-conviction DNA testing during the decade preceding the 2001 enactment of Texas's version. *See* Eric A. Fisher, "DNA Evidence: Legislative Initiatives in the 106th Congress," at 11-13 (Jan. 26, 2001). Both New York's and Illinois's versions contained the word "secured." *See* N.Y. Crim. Proc. Law § 440.30(1-a)(a) (McKinney 2005) ("secured in connection with the trial resulting in the judgment"); 725 Ill. Comp. Stat. 5/116-3(a) (West 2008) ("secured in relation to the trial which resulted in his or her conviction"). In contrast, Arizona's version did not contain the word "secured." *See* Ariz. Rev. Stat. Ann. § 13-4240(A) (2001) ("related to the investigation or prosecution that resulted in the judgment of conviction"). This less restrictive version was "very similar" to a model statute that had been drafted in 2000 by the National Committee on the Future of DNA Evidence. *See* Fisher, "DNA Evidence," at 12.

The Texas Legislature, therefore, had at least two existing approaches it could have followed. Indeed, while the legislation that was enacted contains language similar to New York and Illinois law, *see* Tex. S.B. 3, 77th Leg., R.S. (2001) ("secured in relation to the offense that is the basis of the challenged conviction"), another bill introduced during the 2001 legislative session

19

This does not mean, however, that we consider appellant's request to have the McKinney evidence tested to be unreasonable under the circumstances. It seems to us that testing this evidence may, in fact, both exhibit prudent investigation practice and serve the interest of justice. However, we hold (as we must based on the current statutory language) that, under chapter 64 as currently written, appellant is not entitled to compel such testing. It is likely that the "secured in relation to" language is an attempt by the legislature to find a proper balance between opening the door for a wrongfully convicted person to prove his innocence via DNA testing and not opening the floodgates to require testing of any evidence held by the State in any county and in any case no matter how tenuous the connection to the crime for which the person was convicted. However, in view of the similarities between the two murders at issue here—the same neighborhood, potential method of entry, and stacking of items on the body—this case does not appear to implicate any concern over a lack of relatedness to the crime for which appellant was convicted. It may be that the legislature, when originally enacting chapter 64, did not take into account this type of situation, where a convicted person seeks to prove his innocence by testing evidence secured in relation to a separate, but similar or potentially related, criminal offense. In short, we think this is an issue that the legislature should consider addressing.[7]

---

contained language similar to the Arizona statute, *see* Tex. H.B. 157, 77th Leg., R.S. (2001) ("relates to the investigation or prosecution that resulted in the person's conviction"). This bill was not enacted. Thus, the legislature had the opportunity to enact legislation that did not contain the "secured in relation to" language and yet enacted legislation containing such language.

[7] We note that article 64.01(b) also requires that evidence be "in the possession of the state during the trial of the offense." *See* Tex. Code Crim. Proc. Ann. art. 64.01(b) (West Supp. 2009). This language alone would prohibit the testing of evidence from any crime that occurred *after* the convicted person's trial.

20

Nonetheless, Texas Code of Criminal Procedure article 64.01(b) requires that, for DNA testing to be ordered under chapter 64, the evidence must be secured in relation to the offense that is the basis of the challenged conviction. *See id.* Evidence collected in connection with the investigation of the McKinney murder was not—and has not been—secured in relation to Christine Morton's murder. Therefore, we affirm the district court's denial of appellant's motion to have DNA testing performed on biological evidence collected from the scene of the McKinney murder.

### *Fingerprint Evidence*

Investigators of Christine's murder lifted approximately fifteen fingerprints from the crime scene that were not matched to appellant, Christine, or their son, including two from the unlocked sliding glass door and others from the master bedroom. In his chapter 64 motion for DNA testing, appellant sought a "comparative analysis by an independent fingerprint analyst" of those fingerprints and unidentified prints found at the scene of Mildred McKinney's murder. Appellant also asked that both sets of fingerprints be entered into a national fingerprint database for purposes of locating potential matching candidates.

A chapter 64 motion applies to "evidence containing biological material." *See id.* art. 64.01(a). Appellant does not seek to test biological material such as blood or skin cells from the fingerprints. Appellant seeks only to investigate the identifying characteristics inherent in the fingerprints themselves. This type of fingerprint analysis is not covered by chapter 64 of the code of criminal procedure because it does not involve testing of biological material. *See Skinner v. State*, 122 S.W.3d 808, 812 n.4 (Tex. Crim. App. 2003).

21

The legal question of whether this type of analysis can be compelled under chapter 64 is, of course, distinct from the practical question of whether such an analysis should be done or has been done. It would seem apparent that the unidentified fingerprints from each crime scene should, at a minimum, be compared to one another. The crimes were committed in the same neighborhood and share at least some similar characteristics, and the McKinney case remains unsolved. It is not clear to this Court whether such a comparative analysis has taken place or what the results were. Neither the State's briefing to this Court nor its presentation at oral argument clarified this point.[8] If such an analysis has taken place, the question of whether the appellant could compel such an analysis under chapter 64 would be moot.[9] If such an analysis has not taken place, one immediately wonders what such an analysis might yield—at a minimum for the investigation of the McKinney matter.[10]

Nonetheless, the State is correct that a comparative analysis of this evidence cannot be compelled under chapter 64 of the code of criminal procedure. Consequently, we affirm the district court's denial of appellant's motion to have both independent and comparative analyses performed on the relevant fingerprint evidence from this case and the fingerprints collected in the McKinney case.

---

[8] The State's counsel responding to questions at oral argument stated that he did not know whether such an analysis has been done.

[9] Because of this possibility of mootness, a definitive answer regarding the occurrence of, and results from, a comparative analysis is relevant to our task in this case.

[10] If nothing else, it might well end speculation regarding the potential for the unidentified fingerprints to have been left by the same person. This speculation has also caused Mildred McKinney's surviving adult daughter to join appellant's request to have a comparative analysis of the fingerprints from the two crime scenes performed.

*Conclusion*

We affirm the district court's July 24, 2008 order denying appellant's motion for DNA testing of fingerprint evidence and evidence secured in relation to the murder of Mildred McKinney. However, the district court's August 8, 2006 order is reversed to the extent it denied DNA testing on the blood-stained bandana recovered from behind the Mortons' house, and the cause is remanded to the district court for further proceedings consistent with this opinion.

_____

G. Alan Waldrop, Justice

Before Chief Justice Jones, Justices Waldrop and Henson

Affirmed in part; Reversed and Remanded in part

Filed: January 8, 2010

Publish