# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-13-00230-CR

**Mark Alan Norwood, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 368TH JUDICIAL DISTRICT NO. 11-1600-K368, HONORABLE BURT CARNES, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Mark Alan Norwood of the offense of capital murder.[1] Punishment was automatically assessed at life imprisonment. In two issues on appeal, Norwood asserts that the district court abused its discretion in admitting extraneous-offense evidence. We will affirm the judgment of conviction.

## BACKGROUND

This appeal concerns the 1986 murder of Christine Morton, then the wife of Michael Morton. As the reader is likely well aware—although the fact was not emphasized to the jury below—Michael[2] was wrongfully convicted of Christine's murder in 1987, endured decades-

---

[1] *See* Tex. Penal Code § 19.03.

[2] We identify the Mortons by their first names to avoid confusion.

long incarceration, and was finally exonerated in 2011.[3]  Norwood was prosecuted for Christine's murder thereafter.

Because Norwood does not challenge the sufficiency of the evidence supporting his conviction, we will forego a comprehensive recitation of the trial record in favor of merely noting the basic facts and certain additional evidence pertinent to the issues Norwood does raise.  In this regard, the jury heard evidence that:

• Christine was found dead in the master bedroom of the Williamson County house she shared with Michael and their young son.  Her body was in the bed, which was tucked up tightly. A suitcase and wicker basket were piled over her, toward the head of the bed, and two bed pillows covered her head.

• There was severe trauma to Christine's head and face, and her cause of death was later determined to be a "massive crushing injury" to her head attributed to at least eight blows. A small defensive wound was found on Christine's left hand.  There were no indications that Christine had been sexually assaulted.

• Christine's wallet was found empty of cash, which was unusual, according to Michael, because Christine had generally carried cash.  Similarly, Michael discovered that a .45 caliber Colt Commander handgun he owned was missing from the house.  However, the Mortons' wedding rings, jewelry, and similar valuables had been left undisturbed despite being in plain view.

• A sliding glass door in the Mortons' living room, which led to a fenced back yard, was found unlocked.  Additionally, on the day following Christine's murder, her brother, John Kirkpatrick, discovered footprints on the ground outside the Mortons' back yard fence.[4] Kirkpatrick deduced that someone had likely jumped the fence into the Mortons' back yard.

• From the location outside the fence where he had seen the footprints, Kirkpatrick "turned 180 degrees away from the house" and noticed a wooded lot and a street beyond it. Kirkpatrick "assumed that was where someone would have come from" and "just went as

---

[3]  *See Ex parte Morton*, No. AP-76,663, 2011 WL 4827841 (Tex. Crim. App. Oct. 12, 2011) (not designated for publication) (per curiam).

[4]  Kirkpatrick explained that he had conducted his own independent examination of the crime scene area.

2

straight as I could through those trees to that street." When Kirkpatrick arrived at the street, he observed that he was in a "part of the subdivision that hadn't been developed yet." Near the street, there was a house under construction that "caught his attention," and he proceeded to that site. On the ground at the construction site, Kirkpatrick discovered a blue bandana with discolorations on it.

- Kirkpatrick provided the bandana to law enforcement, which in turn submitted it to the Department of Public Safety (DPS) laboratory for testing. The lab discovered a human hair on the bandana and also determined that the discoloration was human blood. However, at the time of this analysis, DPS did not yet have the technology enabling it to test these items for DNA.

- Eventually, in 2010, the bandana and hair were submitted for DNA analysis.[5] Analysis determined that the blood and hair had a DNA profile consistent with Christine's DNA and that the bandana also contained the DNA profile of an unidentified male.

- The unidentified male DNA profile was entered into the national CODIS[6] database and subsequently matched to Norwood. Further DNA analysis utilizing samples provided by Norwood confirmed the match.

- Ensuing investigation of Norwood's activities near the time of Christine's murder led law enforcement to an individual named Louis Wann, who divulged that he had purchased a .45 caliber Colt Commander from Norwood around that time. Upon inspection, the gun's serial number matched that of the gun owned by Michael that had turned up missing after Christine's murder.

Over Norwood's objections, which we explain more fully below, the district court also admitted evidence regarding the murder of Debra Baker in Travis County, which occurred on or about January 12, 1988, approximately seventeen months after Christine's murder. Regarding this murder, the jury heard evidence that:

---

[5] *See In re Morton*, 326 S.W.3d 634, 648 (Tex. App.—Austin 2010, no pet.).

[6] CODIS stands for Combined DNA Indexing System, a database containing approximately twenty million DNA profiles.

3

- Baker was found dead in her own bed, with her head covered by two bed pillows. Upon removing the pillows, the person who discovered Baker—her mother—had observed that her daughter's head was "very bloody."

- An autopsy revealed that Baker had died from a "massive skull fracture with contusions or bruising on the brain" caused by at least six blows to the head from a blunt object.

- Baker also had minor defensive wounds on her hands. There were no indications that she had been sexually assaulted.

- A VCR was discovered missing from Baker's home, but expensive jewelry, despite being in plain view, had been left undisturbed. Further, cash that had been given to Baker by her sister on the evening of her murder was also missing.

- Police found no evidence of forced entry into Baker's home, and Baker's sister testified that Baker had a tendency to leave a sliding glass door leading into her home unlocked. One of the patrol officers charged with securing the crime scene testified that he had observed leaves in Baker's back yard that were disturbed in a manner suggesting that the attacker had jumped the back fence to either enter or exit the home.

- While analyzing evidence gathered from Baker's home, a DPS analyst had discovered a brownish pubic hair. However, at the time of this analysis, DPS did not yet have the technology enabling it to test the hair for DNA.

- The case went unsolved for several years thereafter. It was reopened in 2005, whereupon another pubic hair was discovered among the debris that had been collected with an evidence vacuum from Baker's home. DNA testing of the hairs, however, was inconclusive.

- In 2011, after Norwood's DNA was linked to the DNA found on the bandana collected near Christine's home, investigators in that case contacted the Austin Police Department Cold Case Unit, which by then had been assigned to the Baker case, and suggested it investigate a similar link to Norwood given the factual similarities between the two cases. Subsequent DNA testing confirmed that the hairs obtained during the course of the Baker investigation matched Norwood's DNA profile. Specifically, the hair obtained from the Baker evidence vacuum contained DNA consistent with Norwood's sample, and both DNA samples contained the same genetic mutation. An expert in genetics and statistics testified that approximately one in thirty-three billion individuals would be expected to have this same profile.

At the conclusion of Norwood's trial for Christine's murder, the jury found Norwood guilty as charged. The district court assessed punishment as noted above. This appeal followed.

4

## ANALYSIS

As previously indicated, both of Norwood's issues on appeal challenge the district court's admission of the extraneous-offense evidence related to the murder of Debra Baker. We review a trial court's decision to admit or exclude evidence for an abuse of discretion.[7] The test for abuse of discretion is whether the trial court acted arbitrarily or unreasonably, without reference to any guiding rules or principles.[8] A trial court abuses its discretion only when its decision "is so clearly wrong as to lie outside that zone within which reasonable persons might disagree."[9]

Norwood objected to the Baker evidence based on Texas Rules of Evidence 403 and 404(b). Rule 404(b) bars evidence of extraneous bad acts merely to show character conformity but permits such evidence for other purposes.[10] Rule 403, in turn, bars otherwise admissible evidence whose probative value is substantially outweighed by the danger of unfair prejudice.[11] In advocating admission of the Baker evidence, the State urged that it tended to prove Norwood's identity as

---

[7] *Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008).

[8] *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990).

[9] *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005).

[10] Rule 404(b) provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.

Tex. R. Evid. 404(b).

[11] *See id*. R. 403.

Christine's killer, one of the purposes for which Rule 404(b) specifically makes extraneous bad acts admissible,[12] and that this probative value was not substantially outweighed by any unfair prejudice so as to warrant exclusion under Rule 403. The district court agreed,[13] and Norwood contends that it abused its discretion with respect to both rules.

**Rule 404(b)**

"An extraneous offense may be admissible to show identity only when identity is at issue in the case."[14] However, "[t]he trial judge has considerable latitude in determining that identity is, in fact, disputed."[15] "It may be placed in dispute by the defendant's opening statement or cross-examination, as well as by affirmative evidence offered by the defense."[16] Here, the district court would not have abused its discretion in finding that the identity of Christine's murderer was a disputed issue in the case. There was no dispute that Christine had been murdered—the issue was instead whether the jury could conclude beyond a reasonable doubt that Norwood had committed the crime, as opposed to someone else. From opening statement, Norwood's counsel attacked that notion, characterizing the State's case as involving "two things only . . . contamination

---

[12] *See id*. R. 404(b); *Segundo v. State*, 270 S.W.3d 79, 87-88 (Tex. Crim. App. 2008); *Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006).

[13] When overruling Norwood's objections, the court observed on the record that "the evidence does fit the requirements of a signature crime under 404(b)," that the evidence was "obviously highly prejudicial but also extremely probative," and that "identity is the key" issue in the case.

[14] *Page*, 213 S.W.3d at 336 (citing *Lane v. State*, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996)).

[15] *Segundo*, 270 S.W.3d at 86.

[16] *Id*.

6

and liars." Counsel's subsequent cross-examination of State witnesses was calculated to raise these sorts of inferences regarding the State's proof. In short, Norwood's defensive theory was that the jury should discount or ignore the State's DNA evidence and other proof tending to implicate Norwood and fail to find that he was the killer. For these and other reasons, the district court could reasonably find that the issue of identity had, in fact, been raised at trial.

However, "[m]erely raising the issue of identity does not automatically render the extraneous evidence admissible."[17] "When the extraneous offense is introduced to prove identity by comparing common characteristics, it must be so similar to the charged offense that the offenses illustrate the defendant's 'distinctive and idiosyncratic manner of committing criminal acts.'"[18] In other words, "the theory of relevancy is usually that of *modus operandi* in which the pattern and characteristics of the charged crime and the uncharged misconduct are so distinctively similar that they constitute a 'signature.'"[19] "No rigid rules dictate what constitutes sufficient similarities; rather, the common characteristics may be proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements which mark both crimes as having been committed by the same person."[20] "Usually, it is the accretion of small, sometimes individually insignificant, details that marks each crime as the handiwork or *modus operandi* of a single individual."[21]

---

[17] *Page*, 213 S.W.3d at 336.

[18] *Id*. (quoting *Martin v. State*, 173 S.W.3d 463, 468 (Tex. Crim. App. 2005)).

[19] *Segundo*, 270 S.W.3d at 88.

[20] *Id*.

[21] *Id*.

7

Here, we cannot conclude that the district court abused its discretion in determining that the pattern and characteristics of Christine's murder versus the Baker murder were so distinctively similar that they constituted a "signature." The evidence tended to show that both victims were white females in their early 30s with long brown hair; were presumably asleep when the attack began; were killed in their beds; were struck between six and eight times in the head with a blunt object; had minor defensive wounds on their hands; and were found with bed pillows covering their heads. Other evidence of similarities included the absence of any sexual assault in either case; apparent entry through an unlocked sliding glass door after jumping a fence in the victim's back yard; the absence of any indication that either victim had known Norwood; and the fact that in both cases cash and a single item of value were stolen—a handgun in Christine's case, a VCR in the Baker case—while jewelry left in plain view was undisturbed. There was also evidence that both murders had taken place on the 13th day of the month and both on Wednesday.

Norwood emphasizes in his brief that there were also ways in which the two murders were dissimilar, including that Christine appeared to have been struck in the head with a *wooden* object while Baker appeared to have been struck in the head with a *metal* object. Nevertheless, in light of the aforementioned similarities between the two crimes summarized above, we conclude that it was within the zone of reasonable disagreement for the district court to find that the Baker murder was sufficiently similar to Christine's murder that evidence of the Baker murder was admissible to prove identity in Christine's case.[22] Accordingly, we cannot conclude that the district court abused its discretion under Rule 404(b). We overrule Norwood's first issue.

---

[22] *See id*. at 89-90.

8

**Rule 403**

We next address Norton's contention that, even if evidence of the Baker murder was relevant and admissible under Rule 404(b), the district court abused its discretion in failing to exclude it under Rule 403. Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[23] But "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial."[24] Evidence should be excluded under Rule 403 only when there exists "a clear disparity between the degree of prejudice of the offered evidence and its probative value."[25] In evaluating a trial court's ruling under Rule 403, "a reviewing court is to reverse the trial court's judgment 'rarely and only after a clear abuse of discretion.'"[26] In making this determination, the court should consider (1) how compellingly evidence of the extraneous offense serves to make a fact of consequence more or less probable; (2) the potential that the extraneous offense will impress the jury in some irrational but indelible way; (3) the trial time needed to develop the evidence; and (4) the proponent's need for the extraneous offense evidence.[27]

---

[23] Tex. R. Evid. 403.

[24] *Young v. State*, 283 S.W.3d 854, 876 (Tex. Crim. App. 2009).

[25] *De La Paz v. State*, 279 S.W.3d 336, 343 n.17 (Tex. Crim. App. 2009) (quoting *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001)).

[26] *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999) (quoting *Montgomery*, 810 S.W.2d at 392 (quoting *United States v. Maggitt*, 784 F.2d 590, 597 (5th Cir. 1986))).

[27] *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002) (citing *Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996)).

The first factor requires the court to consider the strength of the extraneous-offense evidence to make a fact of consequence more or less probable. At trial, Norwood disputed that he was responsible for Christine's murder and his counsel framed this case as being about "contamination and liars." The district court would not have abused its discretion in finding that the Baker murder to which Norwood was linked with DNA evidence and shared many characteristics with Christine's murder is probative of Norwood's identity as the perpetrator of Christine's murder.[28] Consequently, this factor weighs in favor of admissibility.

Second, the court must consider the extraneous-offense evidence for its "potential to impress the jury in some irrational but indelible way."[29] When the extraneous offense is no more heinous than the charged offense, evidence concerning the extraneous offense is unlikely to cause unfair prejudice.[30] Moreover, any impermissible inference of character conformity can be minimized by the use of a limiting instruction.[31]

---

[28] *See McGregor v. State*, 394 S.W.3d 90, 120 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (quoting *Jabari v. State*, 273 S.W.3d 745, 753 (Tex. App.—Houston [1st Dist.] 2008, no pet.)); *see Taylor v. State*, 920 S.W.2d 319, 323 (Tex. Crim. App. 1996) ("[T]he extreme degree of similarity between the two murders renders evidence of the first murder highly probative.").

[29] *Wheeler*, 67 S.W.3d at 888 (citing *Lane*, 933 S.W.2d at 520).

[30] *See Taylor*, 920 S.W.2d at 323 ("[T]he first murder, being no more heinous than the second, was not likely to create such prejudice in the minds of the jury that it would have been unable to limit its consideration of the evidence to its proper purpose."). In this case, the district court would not have abused its discretion in finding that both offenses were equally heinous, as they both involved the violent killing of a young mother while she was in her home alone and asleep in her bed.

[31] *Lane*, 933 S.W.2d at 520 (citing *Montgomery*, 810 S.W.2d at 393); *McGregor*, 394 S.W.3d at 120-21.

At trial, the State did not dwell on the brutal nature of the Baker murder, but instead focused on the similarity between the two offenses and the DNA evidence linking Norwood to the Baker murder. For example, several photographs relating to the Baker murder were admitted into evidence, one of which showed Baker's body at the murder scene, and three of which showed Baker's body at the medical examiner's office. The State used these photos to illustrate for the jury the similarities of the Baker murder to Christine's murder, i.e., to establish that pillows had been placed over both victims' heads and to demonstrate the similar injuries that both victims had suffered. Accordingly, the district court could have reasonably found that the photos were highly probative of the similarity in the *modus operandi* of the attacks and that any danger of unfair prejudice was minimized by the manner in which the State presented the evidence to the jury, which, the district court could have reasonably found, would limit the likelihood that the jury would consider the evidence for an improper purpose.

Additionally, before the district court allowed the State to present evidence of the Baker murder, it gave the following limiting instruction to the jury:

> Ladies and gentlemen of the jury . . . you will be hearing evidence at this point in time about an offense other than the offense on trial. I'm going to instruct you that you cannot consider this evidence for any purpose unless you first find and believe beyond a reasonable doubt that the defendant committed this offense. That's number one. You have to believe it's been proven to you beyond a reasonable doubt.
>
> And, secondly, even then you may only consider that evidence in determining identity in connection with this offense or with the offense, if any, that was committed. And you can—in other words, you can only use that if it helps you determine identity in the case we have on trial. Okay. That's the only purpose for which you can consider this evidence.

The district court included a substantially similar instruction in the written charge.[32] These instructions thus informed the jury that it could consider the Baker evidence only for the purposes of establishing identity and not for character-conformity purposes. For these reasons, the second factor weighs in favor of admissibility.

As to the third factor, the court must consider the trial time needed to develop the extraneous-offense evidence. The evidentiary portion of Norwood's trial lasted approximately six days. The jury heard slightly less than four full days of evidence pertaining solely to Christine's murder. The State spent approximately two full days, or 33% of the trial, presenting evidence solely related to the Baker murder. The State argues that this time was necessary to properly develop the "convoluted chain of custody" and "lengthy evolution of the analysis on the hairs."[33] For support, the State relies on *Segundo*, in which the Court of Criminal Appeals acknowledged that "developing the chain of custody of vaginal swabs, the analysis for semen, and the identification of the DNA profile that was then matched with [the accused's DNA], requires a long list of witnesses and a slow plod through the pertinent scientific procedures."[34] And, as in *Segundo*, the State asserts that

---

[32] The instruction in the jury charge read:

> You are further instructed that if there is any evidence before you in this case regarding the defendant having committed an alleged offense or offenses other than the offense alleged against him in the indictment in this case, you cannot consider such evidence for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense or offenses, if any, and even then you may only consider the same in determining identity in connection with the offense, if any, alleged against him in the indictment and for no other purpose.

[33] According to the testimony at trial, the hairs were submitted to laboratories for testing four separate times over a period of more than twenty years and the samples were renumbered each time.

[34] *Segundo*, 270 S.W.3d at 90.

it took pains to focus on "the unemotional science of DNA profiling and identification, not the gory details of the extraneous murder."[35] Nevertheless, the fact remains that nearly one-third of the trial testimony focused on an offense for which Norwood was not on trial. This factor arguably weighs against the admissibility of the evidence.[36]

The fourth factor examines the State's need for the evidence. This case was more than twenty-five years old by the time it was tried. There were no eyewitnesses to Christine's murder. In fact, as the State acknowledged, all of the evidence connecting Norwood to the murder was circumstantial. Although the presence of both Norwood's DNA and Christine's blood on a bandana found at a construction site near Christine's house might be compelling circumstantial evidence of Norwood's guilt, it "does not directly identify him as her attacker."[37] Under these circumstances, the district court could have reasonably found that the State had a considerable need to present evidence related to the Baker murder.[38] This factor, therefore, favors admissibility of the extraneous-offense evidence.

When all four factors are considered together, only the third factor, the time spent developing the evidence concerning the extraneous offense, arguably weighs against admissibility.

---

[35] *Id*. The State notes that of the seventeen witnesses that testified regarding the Baker murder, fourteen were either law enforcement officers or forensic scientists.

[36] *See McGregor*, 394 S.W.3d at 121-22 (holding factor weighed in favor of exclusion when evidence of extraneous offense amounted to approximately thirty-three percent of trial time); *Newton v. State*, 301 S.W.3d 315, 320-21 (Tex. App.—Waco 2009, pet. ref'd) (same, twenty-seven percent); *Russell v. State*, 113 S.W.3d 530, 545-46 (Tex. App.—Fort Worth 2003, pet. ref'd) (same, thirty percent).

[37] *See Jabari*, 273 S.W.3d at 753.

[38] *See Taylor*, 920 S.W.2d at 323; *Hartsfield v. State*, 305 S.W.3d 859, 872-73 (Tex. App.—Texarkana 2010, pet. ref'd).

13

We conclude that the district court was within the zone of reasonable disagreement when it found that the probative value of evidence related to the Baker murder was not substantially outweighed by its prejudicial effect.[39] We cannot conclude on this record that the district court abused its discretion in admitting evidence related to the Baker murder pursuant to Rule 403.

We overrule Norwood's second issue.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed:   August 15, 2014

Do Not Publish

---

[39] *See Taylor*, 920 S.W.2d at 322-23; *McGregor*, 394 S.W.3d at 120-22.